**2025 WI 32**

# Supreme Court of Wisconsin



JOSH KAUL, et al.,
*Plaintiffs-Respondents,*

*v.*

JOEL URMANSKI, et al.,
*Defendant-Appellant.*

No. 2023AP2362
Decided July 2, 2025

APPEAL from a judgment and an order of the Dane County Circuit
Court (Diane Schlipper, J.), No. 2022CV1594

DALLET, J., delivered the majority opinion of the Court, in which
KAROFSKY, C.J., ANN WALSH BRADLEY and PROTASIEWICZ, JJ., joined.
KAROFSKY, C.J., filed a concurring opinion. ZIEGLER, J., filed a dissenting
opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.
HAGEDORN, J., filed a dissenting opinion, in which REBECCA GRASSL
BRADLEY, J., joined.

¶1 REBECCA FRANK DALLET, J. In *Dobbs v. Jackson Women's
Health Organization*, 597 U.S. 215, 231 (2022), the United States Supreme
Court overruled decades of precedent including *Roe v. Wade*, 410 U.S. 113
(1973), and held for the first time that the United States Constitution does
not protect the right to abortion. In the wake of that decision, Plaintiffs
filed this lawsuit seeking a declaration that WIS. STAT. § 940.04(1) (2023–

24)[1]—a statute dating back to 1849 that criminalizes the intentional destruction of an unborn child—does not ban abortion.

¶2 We conclude that comprehensive legislation enacted over the last 50 years regulating in detail the "who, what, where, when, and how" of abortion so thoroughly covers the entire subject of abortion that it was meant as a substitute for the 19th century near-total ban on abortion. Accordingly, we hold that the legislature impliedly repealed § 940.04(1) as to abortion, and that § 940.04(1) therefore does not ban abortion in the State of Wisconsin.

I

¶3 Shortly after *Dobbs* was decided, Attorney General Josh Kaul, along with the Department of Safety and Professional Services, the Medical Examining Board, and its chairperson brought this case. They, along with three physicians who were subsequently permitted to intervene as plaintiffs, seek a declaratory judgment that § 940.04(1) does not ban abortion because it either does not apply to abortion at all, or has been impliedly repealed as to abortion by numerous subsequent statutes.

¶4 Plaintiffs named as defendants the district attorneys of Sheboygan, Milwaukee, and Dane Counties: Joel Urmanski, John Chisholm,[2] and Ismael Ozanne. District Attorney Urmanski moved to dismiss.[3] He contended that Plaintiffs failed to state claims upon which

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

[2] District Attorney Chisholm's term in office ended in January 2025. His successor, Kent Lovern, has thus been automatically substituted as a party to this appeal. *See* WIS. STAT. § 803.10(4)(a).

[3] As a threshold matter, Urmanski argued that Attorney General Kaul, the Department of Safety and Professional Services, the Medical Examining Board, and its chairperson lacked standing to assert one of their claims. Although the circuit court rejected that argument, before this court, Urmanski again argues that they lack standing to assert that claim. We need not address standing, however, because Urmanski concedes that one or more of the Plaintiffs has standing to assert every claim at issue in this case. *See Clarke v. WEC*, 2023 WI 79,

relief could be granted because § 940.04(1) applies to and may be enforced as to abortion and was not impliedly repealed or superseded by any subsequently enacted statutes.

¶5      The circuit court denied Urmanski's motion, concluding that the Plaintiffs stated a claim upon which relief could be granted because § 940.04 "says nothing about abortion," and "does not prohibit a consensual medical abortion." The circuit court later issued a declaratory judgment that "WIS. STAT. § 940.04 does not prohibit abortions."

## II

¶6      Urmanski appeals the circuit court's denial of his motion to dismiss and subsequent order granting summary judgment. We review these decisions *de novo*. *Doe 56 v. Mayo Clinic Health Sys.—Eau Claire Clinic, Inc.*, 2016 WI 48, ¶14, 369 Wis. 2d 351, 880 N.W.2d 681.

## III

¶7      The central question before us is whether § 940.04(1) bans abortion. That subsection, or a precursor to it, has been on the books since 1849 and prohibits "intentionally destroy[ing] the life of an unborn child" subject only to a narrow exception for a "therapeutic abortion" that is necessary to save the life of the mother. *See id.* (1), (5); *see also* WIS. STAT. ch. 133, § 11 (1849).

¶8      Initially, § 940.04(1) or its predecessors were used to prosecute people for providing abortions.[4] But § 940.04(1) has not been enforced in that way at least since *Roe*, and over the last 50 years, the legislature passed a myriad of other statutes regulating abortion. Some

_____

¶39 & n.19, 410 Wis. 2d 1, 998 N.W.2d 370 (explaining that "as long as one of the [Plaintiffs] has standing, th[e] case may proceed").

[4] *See, e.g.*, *State v. Mac Gresens*, 40 Wis. 2d 179, 184–86, 161 N.W.2d 245 (1968) (affirming a conviction under § 940.04(1) for providing an abortion); *State ex rel. Tingley v. Hanley*, 248 Wis. 578, 580–84, 22 N.W.2d 510 (1946) (upholding a conviction for providing an abortion under a predecessor to § 940.04(1)); *Hatchard v. State*, 79 Wis. 357, 360, 48 N.W. 380 (1891) (affirming a conviction for assisting in providing an abortion under a predecessor to § 940.04(1)).

prohibit abortion only in narrower circumstances, specifically after viability, *see* WIS. STAT. § 940.15, after 20 weeks of pregnancy, *see* WIS. STAT. § 253.107, or so-called "partial birth abortions," *see* WIS. STAT. § 940.16. Many others specify where, when, and how health-care providers may lawfully perform abortions. *See, e.g.*, WIS. STAT. §§ 48.375, 69.186, 253.095, 253.105, 253.10. And still more describe the circumstances under which state, county, or municipal funds may go to providing abortion services or entities that provide such services. *See, e.g.*, WIS. STAT. §§ 253.07(5)(b)–(c); 253.075(5)(b)–(c); 66.0601(1)(b)–(c); 59.53(13); *see also* WIS. STAT. § 20.927(2).

¶9    Plaintiffs argue that interpreting and enforcing § 940.04(1) as a near-total ban on abortion would render these subsequent laws meaningless. Accordingly, Plaintiffs urge us either to interpret § 940.04(1) as prohibiting only feticide, not abortion, or to hold that the legislature's subsequent enactments impliedly repealed § 940.04(1) as to abortion. Urmanski disagrees, contending that the plain language of § 940.04(1) bans nearly all abortions[5] and that the legislature has not impliedly repealed that prohibition.

¶10    We focus our analysis on Plaintiffs' second argument because it is dispositive. We conclude that, under the unique circumstances presented here, the legislature impliedly repealed § 940.04(1) as to abortion by enacting comprehensive legislation about virtually every aspect of abortion including where, when, and how health-care providers may lawfully perform abortions. That comprehensive legislation so thoroughly covers the entire subject of abortion that it was clearly meant as a substitute for the 19th century near-total ban on abortion. As a result, we hold that § 940.04(1) does not prohibit abortion in the State of Wisconsin.

---

[5] We acknowledge that Urmanski's interpretation of § 940.04(1) is in tension with our prior decision in *State v. Black*, 188 Wis. 2d 639, 526 N.W.2d 132 (1994), which described the similar language in § 940.04(2)(a)—"intentionally destroy[ing] the life of an unborn quick child"—as "not an abortion statute," and as a feticide statute only. *See id.* at 646. Urmanski asks us to overrule that decision, while Plaintiffs urge us to extend *Black*'s narrow, feticide-only interpretation to § 940.04(1). We need not address these arguments, however, because even setting *Black* aside, if § 940.04(1) prohibits abortion, then the legislature has impliedly repealed that prohibition.

A

¶11    A statute may be repealed either expressly, by enacting a subsequent statute that repeals the earlier one, or by implication. *State v. Dairyland Power Coop.*, 52 Wis. 2d 45, 51, 187 N.W.2d 878 (1971). Although implied repeal is "not a favored concept in the law," *id.*, it is nonetheless deeply rooted in Wisconsin law and is indeed older than the state itself. *See, e.g.*, *Richardson v. Sheldon*, 1 Pin. 624, 630 (Wis. Terr. 1846); *Attorney General ex rel. Taylor v. Brown*, 1 Wis. 513, 525–26 (1853); *see also Dairyland*, 52 Wis. 2d at 51; *State v. Vilamil*, 2017 WI 74, ¶37, 377 Wis. 2d 1, 898 N.W.2d 482.

¶12    Our cases have identified two narrow circumstances in which the doctrine applies. The first is when a subsequent law "contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force . . . ." *Dairyland*, 52 Wis. 2d at 51 (quoting another source). Although the parties make arguments based on this first type of implied repeal, we focus instead on the second type, which occurs when the legislature adopts comprehensive legislation through one or more acts[6] that so thoroughly covers the entire

---

[6] Our cases have sometimes described this situation in the singular, that is, whether an earlier act was impliedly repealed by a single later one that so thoroughly covered the subject that it was clearly meant as a substitute. *See, e.g.*, *State v. Campbell*, 44 Wis. 529, 535 (1878). But we have never held—and no party before us argues—that multiple acts passed over time cannot do the same thing. In fact, both our court and others have concluded that multiple acts passed over time impliedly repealed earlier acts. *See, e.g.*, *Eichenseer v. Madison–Dane Cnty. Tavern League, Inc.*, 2008 WI 38, ¶¶55-66, 308 Wis. 2d 684, 748 N.W.2d 154 (concluding that an entire chapter of the statutes that was largely enacted in 1981 and substantially amended numerous times since then had impliedly repealed a specific application of the antitrust laws); *see also McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004) (applying Texas law to conclude that state regulations on abortion adopted over several decades were "intended to form a comprehensive scheme," and thus impliedly repealed statutes criminalizing abortion); *In re Leon Guerrero*, 2023 Guam 11, ¶¶41–45, 52–55 (concluding that statutes passed in 1994, 2008, and 2012, and subsequently amended, impliedly repealed an earlier criminal ban on abortion); *Dillon v. Bicknell*, 47 P. 937, 937–38 (Cal. 1897) (concluding that two acts passed eight years apart were intended "'to revise the entire subject-matter'" and thus impliedly repealed an earlier law (quoting another source)).

subject of the earlier statute that it was clearly meant as a substitute for that earlier law. *See Wisth v. Mitchell*, 52 Wis. 2d 584, 589, 190 N.W.2d 879 (1971); *see also Gilkey v. Cook*, 60 Wis. 133, 139, 18 N.W. 639 (1884); 1A Sutherland Statutory Construction § 23:9 (8th ed. 2025). Such legislation is comprehensive if it "revise[s] the entire subject to which it relates" by establishing "elaborate inclusions and exclusions of the persons, things and relationships ordinarily associated with the subject." *Wisth*, 52 Wis. 2d at 589 (quoting another source).

B

¶13     Plaintiffs contend that the legislature enacted comprehensive legislation over the last 50 years when it adopted numerous statutes thoroughly covering the entire subject of abortion including those detailing where, when, and how health-care providers may lawfully perform abortions. According to Plaintiffs, these statutes so thoroughly cover the subject of abortion that they were clearly meant as a substitute for the near-total ban on abortion in § 940.04(1). Urmanski disagrees, arguing that this comprehensive legislation is consistent with a near-total ban on abortion in § 940.04(1) and that the text, as well as the statutory and legislative history of § 940.04 and other subsequent laws indicate that the legislature intended to preserve § 940.04(1) as a near-total ban on abortion.

¶14     We agree with Plaintiffs. To understand why, we begin by describing § 940.04 and the numerous subsequently enacted statutes detailing the "who, what, where, when, and how" of abortion. We then explain why these many subsequently enacted statutes form a comprehensive statutory scheme that thoroughly covers the entire subject of abortion and thus impliedly repealed § 940.04(1) as to abortion.

1

¶15     We start with § 940.04, the full text of which[7] provides:

_____

[7] Although prior versions of § 940.04 contained subsections (3)–(4), they were repealed without renumbering the remaining subsections. *See* 2011 Wis. Act 217, § 11. We address this amendment further in Part III.B.2, *infra*.

**(1)** Any person, other than the mother, who intentionally destroys the life of an unborn child is guilty of a Class H felony.

**(2)** Any person, other than the mother, who does either of the following is guilty of a Class E felony:

    **(a)** Intentionally destroys the life of an unborn quick child; or

    **(b)** Causes the death of the mother by an act done with intent to destroy the life of an unborn child. It is unnecessary to prove that the fetus was alive when the act so causing the mother's death was committed.

**(5)** This section does not apply to a therapeutic abortion which:

    **(a)** Is performed by a physician; and

    **(b)** Is necessary, or is advised by 2 other physicians as necessary, to save the life of the mother; and

    **(c)** Unless an emergency prevents, is performed in a licensed maternity hospital.

**(6)** In this section "unborn child" means a human being from the time of conception until it is born alive.

¶16     This statute's earliest predecessor was enacted in 1849. *See* WIS. STAT. ch. 133, § 11 (1849). When Wisconsin adopted the first modern criminal code in 1955, the legislature revised and consolidated the amended version of that 1849 law, along with several other earlier statutes governing abortion, into § 940.04, titling that section "Abortion." *See* § 1, ch. 696, Laws of 1955. A legislative committee report on the statute that later became § 940.04 described it as "penaliz[ing] the person who performs an abortion on another," and "a substantial restatement of the present law." WIS. LEGIS. COUNCIL, JUDICIARY COMM. REP. ON THE CRIM. CODE 66–67 (1953). And our court applied it as such, upholding a conviction under § 940.04(1) for providing an abortion. *See, e.g., State v. Mac Gresens*, 40 Wis. 2d 179, 184–86, 161 N.W.2d 245 (1968).

7

¶17 But that was over 50 years ago. In the decades since, the legislature has enacted a myriad of statutes governing abortion. Most of these statutes[8] fall into three broad categories. First, the legislature adopted criminal laws prohibiting abortions in narrower circumstances than § 940.04(1). Second, the legislature adopted statutes regulating where, when, and how health-care providers may lawfully perform abortions. And third, the legislature adopted statutes specifying the circumstances under which state, county, or municipal funds may go to providing abortion services or entities that provide such services.

¶18 The first of the criminal laws narrower than § 940.04(1) is § 940.15, which was adopted more than a decade after *Roe* was decided, in 1985. *See* 1985 Wis. Act 56, § 35. Like § 940.04, § 940.15 is titled "Abortion" but it criminalizes only abortions performed after viability.[9] *See id.* (2). "Viability" is defined as "that stage of fetal development when, in the medical judgment of the attending physician . . . there is a reasonable likelihood of sustained survival of the fetus outside the womb, with or without artificial support." § 940.15(1).

¶19 Section 940.15 also allows for post-viability abortions that are "necessary to preserve the life or health of the woman, as determined by reasonable medical judgment of the woman's attending physician." *Id.* (3). Abortions performed after viability must also be done "in a hospital on an inpatient basis" and "use that method of abortion which, of those

---

[8] Some other statutes do not fit neatly into these categories. For example, a handful specify that health-care providers may not be held civilly liable for refusing to provide abortions on moral or religious grounds. *See* WIS. STAT. §§ 253.09; 441.06(6); 448.03(5)(a). And another one requires reporting to law enforcement, the medical examiner, or coroner of "deaths following an abortion." WIS. STAT. § 979.01(1)(d).

[9] WISCONSIN STAT. § 940.15(7) specifies that people who obtain abortions in violation of § 940.15 may not be held criminally liable for doing so. At the same time it adopted that provision, the legislature also passed WIS. STAT. § 940.13, which provides a more general exception to criminal liability for obtaining abortions, stating that "[n]o fine or imprisonment may be imposed or enforced against and no prosecution may be brought against a woman who obtains an abortion or otherwise violates any provision of any abortion statute with respect to her unborn child or fetus . . . ." *See* 1985 Wis. Act 56, § 34.

[the physician] knows to be available, is in his or her medical judgment most likely to preserve the life and health of the fetus or unborn child." *Id.* (4), (6).

¶20 Since 1985, the legislature has enacted two other criminal laws that are narrower than § 940.04(1). In 1997 it adopted § 940.16, which prohibits "partial-birth abortions" unless they are necessary to save the life of the mother. *See* 1997 Wis. Act 219, § 2. And in 2015, the legislature enacted § 253.107, which makes it a Class I felony to "perform or induce an abortion" or attempt to do so if "the probable postfertilization age of the unborn child is 20 or more weeks" unless "the woman is undergoing a medical emergency." § 253.107(3)(a); *see also* 2015 Wis. Act 56, § 7.

¶21 Aside from these criminal laws, the legislature has adopted many additional statutes regulating where, when, and how health-care providers may lawfully perform abortions. The earliest versions of these statutes required abortion providers to give information to patients regarding fetal age, pregnancy and birth-control resources, adoption, and the risks of an abortion. *See* 1985 Wis. Act 56, § 32; *see also* WIS. STAT. § 46.245 (mandating that county departments of health or social services distribute materials on these topics upon request). Those requirements were subsequently amended several times and consolidated into what is now § 253.10, which also imposes more prerequisites like an ultrasound and a 24-hour waiting period before an abortion may be performed except in cases of medical emergency. *See* § 253.10(2)(d), (3)(c)–(f), (3g); *see also, e.g.*, 1995 Wis. Act 309, § 4; 2011 Wis. Act 217, §§ 1–9.[10] Additionally, in 1991, the legislature enacted § 48.375, which requires parental consent or court waiver before minors may obtain abortions except in medical emergencies.[11] *See* 1991 Wis. Act 263, §§ 10, 22. And more recently, in 2011 and 2013, the legislature imposed conditions that must be met before providing medication abortions, *see* § 253.105, amended the requirements for voluntary and informed consent, *see generally* § 253.10, and mandated

---

[10] Additionally, the legislature required hospitals and clinics that provide abortions to file annual reports with the Department of Health Services regarding the abortions they performed. *See* § 69.186.

[11] The legislature also enacted statutes specifying that circuit courts have jurisdiction over petitions to waive this requirement and establishing procedures for appeals from waiver decisions. *See* WIS. STAT. §§ 48.16, 809.105.

that physicians who perform abortions have admitting privileges at a hospital "within 30 miles of the location where the abortion is to be performed." § 253.095(2), *enacted by* 2013 Wis. Act 37, § 1.

¶22 The final category of laws specify the circumstances under which state, county, or municipal funds may go to providing abortion services or entities that provide such services. The first such law, WIS. STAT. § 20.927, was passed in 1977 and prohibited state, county, or municipal funds (as well as federal funds that passed through the state treasury) from being used to fund abortions except in three circumstances: (1) when the abortion is "directly and medically necessary to save the life of the woman," (2) in cases of sexual assault or incest provided the crime was reported to law enforcement, and (3) when "the abortion is directly and medically necessary to prevent grave, long-lasting physical health damage to the woman." *See id.* (2)(a)–(b); *see also* § 2, ch. 245, Laws of 1977. This limitation and its three exceptions have since been incorporated by reference in statutes regulating municipal and county appropriations, WIS. STAT. §§ 66.0601(1)(b), 59.53(13); state-funded insurance plans, *see* WIS. STAT. §§ 40.56, 632.8985(2), 40.03(6)(m); and certain state grants, *see* WIS. STAT. §§ 253.075(5)(c), 253.07(5)(c).

2

¶23 Collectively, these statutes constitute "comprehensive legislation" encompassing the "entire subject" of abortion and establishing "elaborate inclusions and exclusions of the persons, things and relationships ordinarily associated with the subject." *Wisth*, 52 Wis. 2d at 589 (quoting another source). Indeed, these statutes specify, often in extraordinary detail, the answer to nearly every conceivable question about abortion. Who may perform abortions? Only doctors. *See* § 940.15(5). Where may abortions be performed? Within 30 miles of a hospital where the doctor has admitting privileges. *See* § 253.095(2). When may abortions be performed? Prior to viability or 20 weeks of pregnancy except when necessary to preserve the life or health of the mother or in a medical emergency. *See* §§ 940.15(2)–(3); 253.107(2)–(3). What must happen before an abortion is performed? Information must be provided to patients regarding the risks of an abortion, fetal age, pregnancy and birth-control resources, and adoption; voluntary and informed consent must be obtained (as well as parental consent or court waiver for minors); and an ultrasound and 24-hour waiting period must take place except in an emergency. *See generally* §§ 48.257, 48.375, 253.10. When may state, county, or municipal funds be used to fund abortions? Only when the abortion is

medically necessary to save the life of the mother or to prevent grave, long-lasting physical harm, or in cases of sexual assault or incest that have been reported to law enforcement. *See* § 20.927(2)(a)–(b). The list goes on.

¶24 Critically, this comprehensive legislation would serve no purpose if § 940.04(1) criminalizes all but "therapeutic abortion[s]" necessary to save the life of the mother. After all, if abortion is illegal at all times, then there is no need to separately prohibit post-viability abortions, *see* § 940.15, or abortions performed after 20 weeks of pregnancy, *see* § 253.107, or "partial-birth abortions," *see* § 940.16. Similarly, there would be no need for the legislature to create much broader exceptions than § 940.04(1) contains for, respectively, abortions "necessary to preserve the life *or health* of the woman," or "medical emergenc[ies]." *See* §§ 940.15(3) (emphasis added), 253.107(2); *see also* § 253.10(2)(d) (defining "medical emergency"). The exceptions and prohibitions in §§ 940.15 and 253.107 would be swallowed whole by § 940.04(1) if that statute bans nearly all abortions.[12]

¶25 There would also be little or no need for the many non-criminal statutes requiring, for example, that physicians who perform abortions have admitting privileges at nearby hospitals, or mandating that they obtain voluntary and informed consent (and parental consent or court waiver for minors) before providing abortions. *See, e.g.,*

---

[12] Moreover, the relationship between § 940.04(1) and §§ 940.15 and 253.107 is unlike the far more common relationship between a general criminal statute and lesser-included and aggravated versions of that offense. In that familiar scenario, the legislature typically enacts a general criminal statute with a specific penalty, and then adopts lesser-included offenses with lower criminal penalties, and aggravated offenses with greater criminal penalties. *See, e.g.,* WIS. STAT. §§ 940.19, 940.195, 940.198, 940.20, 940.201, 940.203, 940.204, 940.205, 940.207, 940.208 (adopting both general criminal prohibitions on battery and specifying different penalties for numerous lesser-included and aggravated versions of battery). Here, by contrast, the penalty for violating § 940.04(1) is a Class H felony, while violations of §§ 940.15 and 253.107, are treated as less serious Class I felonies. *See also* § 939.50(3)(h), (i). That means that an abortion that takes place after viability could thus be punished as either a Class H or Class I felony depending on how it is charged. Meanwhile, an abortion that takes place earlier, before 20-weeks of pregnancy, could be punished only as a more serious Class H felony.

§§ 253.095(2), 253.105(2), 253.10(3)–(3g). As with the criminal prohibitions in §§ 940.15, 940.16, and 253.107, these provisions—enforceable only by forfeiture or civil liability for damages[13]—would be essentially meaningless if abortion is simply illegal except when it is necessary to save the life of the mother.[14]

¶26   What's more, if abortion is simply illegal except when it is necessary to save the life of the mother, then numerous statutes specifically authorize the state, counties, or municipalities to subsidize a crime. Those statutes provide that state, county, and municipal funds may go directly to funding abortions in cases of sexual assault or incest that have been reported to law enforcement, or if the abortion is "directly and medically necessary to prevent grave, long-lasting physical health damage to the woman . . . ." *See* § 20.927(2)(a)–(b); *see also* §§ 66.0601(1)(b), 59.53(13)(a), 40.56, 632.8985(2), 40.03(6)(m). But performing abortions

---

[13] *See, e.g.*, §§ 253.095(2)–(4) (providing forfeitures and civil remedies for violations of the admitting-privileges requirement), 253.10(6) (authorizing civil actions for violations of the voluntary- and informed-consent and ultrasound requirements); *see also* WIS. STAT. § 895.037(2)–(3) (authorizing forfeitures and civil remedies for violations of the parental-consent or judicial-waiver requirements for minors who seek abortions).

[14] It is true, as Urmanski notes, that a few of these regulations would still apply in the rare circumstance where abortions were performed pursuant to § 940.04(5)'s exception for abortions necessary to save the life of the mother. *See, e.g.*, § 69.186 (requiring annual reporting by hospitals, clinics, and other facilities of abortions performed there); § 253.095(2) (mandating that physicians performing abortions have admitting privileges at a hospital within 30 miles). But there are many other requirements that would have no effect at all. For example, the detailed voluntary- and informed-consent requirements in § 253.10 impose a 24-hour waiting period and require an ultrasound before an abortion may performed, and require information be given to pregnant women about both the abortion procedure and alternatives to obtaining an abortion. *See generally* § 253.10(3)(c)–(d), (3g). These requirements serve no purpose if the only circumstance in which abortion is available is if the mother would otherwise die because they are already waived in a medical emergency. *See id.* (2)(d), (3)(f). Similarly, § 48.375, which requires parental consent or court-obtained waiver of consent before minors may obtain abortions would be pointless, since that statute also contains an exception for medical emergencies. *See* § 48.375(4)(b)1.

under those circumstances would be a crime if § 940.04(1) bans all abortions except those that are necessary to save the life of the mother. It would be nonsensical to say the least for the legislature to enact statutes authorizing the state, counties, or municipalities to subsidize a crime. Indeed, we are aware of no other circumstance in which the legislature has done so. Under these unusual circumstances, we therefore conclude that the last 50 years of comprehensive legislation thoroughly covering the entire subject of abortion must be understood as a substitute for any earlier prohibition on abortion in § 940.04(1). *See Gilkey*, 60 Wis. at 139.

¶27 This conclusion is consistent with decisions by several other courts holding that comprehensive legislation governing abortion impliedly repealed earlier abortion bans. For example, in *McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004), the Fifth Circuit concluded that Texas's criminal abortion ban was impliedly repealed by the enactment of "a comprehensive set of civil regulations" governing the availability of abortion, practices and procedures of abortion clinics, and funding for abortions. *See id.* at 849. Those regulations, the court explained, were "intended to form a comprehensive scheme—not an addendum to the criminal statutes," and thus impliedly repealed Texas's earlier criminal ban on abortion. *See id.* A federal district court in Arkansas reached a similar conclusion, explaining that a "regulatory scheme for the performance of legal abortions" was inconsistent with, and impliedly repealed, an earlier criminal ban. *Smith v. Bentley*, 493 F. Supp. 916, 924 (E.D. Ark. 1980); *see also Weeks v. Connick*, 733 F. Supp. 1036, 1038–39 (E.D. La. 1990) (reaching a similar conclusion with respect to two Louisiana laws). And more recently, after *Dobbs*, the Supreme Court of Guam concluded that laws banning "partial-birth abortion," regulating voluntary and informed consent, and requiring reporting of abortions impliedly repealed an earlier categorical ban on abortion in the territory. *See In re Leon Guerrero*, 2023 Guam 11, ¶52; *see also Women's Health Ctr. of W. Va. v. Miller*, No. 22-C-556, 2022 WL 3443446, at *6–9 (W. Va. Cir. Ct. July 20, 2022) (preliminarily enjoining West Virginia's criminal abortion ban after *Dobbs* because it was impliedly repealed by a later comprehensive statutory scheme).

¶28 Urmanski nevertheless argues that these subsequent statutes are not at odds with a near-total ban on abortion in § 940.04(1) because by complying with § 940.04(1), one necessarily complies with all these other statutes. But this just proves Plaintiffs' point. The only way one complies with § 940.04(1) is by not performing any abortions except when they are necessary to save the life of the mother. Yet these comprehensive statutes,

including the numerous laws detailing where, when, and how health-care providers may perform abortions, all contemplate abortions lawfully occurring in a far wider set of circumstances. Urmanski's argument that we should read § 940.04(1) to swallow these statutes completely thus does not render them compatible, it only underscores the fact that they were meant as a substitute for § 940.04(1).

¶29 We also reject Urmanski's claims that statutory and legislative history demonstrate that the legislature did not impliedly repeal § 940.04. Taking the statutory history first, Urmanski points out that the legislature changed the penalty for violating § 940.04 in 2001 and in 2011 it repealed § 940.04(3)–(4), which clarified that criminal penalties were available for pregnant women who obtained abortions. Additionally, in 1997 the legislature adopted WIS. STAT. § 939.75(2)(b)1., which stated that several newly adopted feticide statutes did not "limit the applicability of ss. 940.04, 940.13, 940.15 and 940.16 to an induced abortion." *See* 1997 Wis. Act 295, § 12. These statutory changes, he argues, demonstrate that the legislature believed that § 940.04(1) was not impliedly repealed, and still prohibited nearly all abortions.

¶30 The problem with Urmanski's argument is that there are far more compelling explanations for these changes. The 2001 amendment Urmanski cites was part of Wisconsin's adoption of Truth-in-Sentencing, which was a wholesale revision of penalty provisions across Wisconsin's criminal statutes. *See* 2001 Wis. Act 109, §§ 586-88. We find it unlikely that the legislature buried an unwritten intention that § 940.04(1) not be impliedly repealed as to abortion in a bill that revised scores of criminal-penalty statutes applicable to everything from adultery to administering dangerous or stupefying drugs. *See* 2001 Wis. Act 109, §§ 689, 816. As for the legislature's repeal of § 940.04(3)–(4), that too has a simple explanation. Subsections (3) and (4) were already unenforceable when they were repealed because they were contrary to § 940.13, which already prohibited prosecuting pregnant women for obtaining abortions. Thus, this clean-up amendment tells us nothing about whether the legislature thought a near-total ban on abortion in § 940.04(1) had been impliedly repealed. And finally, Urmanski gives too much weight to the reference to § 940.04 in § 939.75(2)(b)1. That subdivision, which creates an exception to statutes prohibiting feticide, states that it does not "limit the applicability of ss. 940.04, 940.13, 940.15 and 940.16 to an induced abortion." We cannot accept Urmanski's characterization of this statute as a list of all criminal prohibitions on abortion, however, because it references § 940.13—a statute that does not prohibit abortions. Instead, we view that paragraph

as doing merely what it says it does: creating an exception to the newly enacted feticide statutes.

¶31    Urmanski's argument based on the legislative history of § 940.15 is likewise unpersuasive. As Urmanski points out, when it enacted § 940.15, the legislature considered but did not adopt language repealing § 940.04 in its entirety. *See* 1985 Assembly Bill 510, § 26. Based on that, he argues that "[i]t is not for this court to do what the legislature has chosen not to do," namely hold that § 940.04(1) has been impliedly repealed as to abortion. *State v. Gonnelly*, 173 Wis. 2d 503, 513, 496 N.W.2d 671 (Ct. App. 1992). But this legislative history is more unclear than Urmanski lets on, since the legislature also considered but did not adopt language in the same act specifying that § 940.15 *did not* impliedly repeal § 940.04.[15] *See* Drafting File, 1985 Wis. Act 56. When, as in this situation, legislative history is unclear, we do not rely on it. *See, e.g.*, *State v. Rector*, 2023 WI 41, ¶¶29–30, 407 Wis. 2d 321, 990 N.W.2d 213. Moreover, § 940.15 alone did not impliedly repeal § 940.04(1) as to abortion. Fifty years' worth of comprehensive legislation did that.[16]

¶32    We further reject Urmanski's reliance on language in some, but not all, of Chapter 253's regulations on abortion that those provisions may not "be construed as creating or recognizing a right to abortion or as making lawful an abortion that is otherwise unlawful." *See, e.g.*, §§ 253.10(8), 253.105(6), 253.107(7). According to Urmanski, these

---

[15] The absence of this language in § 940.15 or the many other laws that comprise the comprehensive statutory scheme governing abortion distinguishes this case from *Planned Parenthood Arizona, Inc. v. Mayes*, 545 P.3d 892 (Ariz. 2024). In that case, the Arizona Supreme Court rejected an argument that the state's 15-week abortion ban impliedly repealed an earlier categorical abortion ban, noting that their legislature specified that adopting the 15-week ban did not "[r]epeal, by implication or otherwise" the earlier law. *See id.* at 899.

[16] For this reason, our statement in *Black* that "[n]othing persuades us that the legislature intended to impliedly repeal sec. 940.04(2)(a) when it enacted sec. 940.15" is distinguishable. *See Black*, 188 Wis. 2d at 645. The question *Black* was addressing—whether § 940.15 alone impliedly repealed § 940.04(2)(a) in its entirety—is different than the one before us, namely whether the subsequent comprehensive legislation governing abortion (much of which was enacted after *Black* was decided) impliedly repealed § 940.04(1) as to abortion.

provisions were meant to regulate abortions that were legal under *Roe* while also maintaining a near-total ban on abortion if *Roe* were ever overturned. But what about the many other regulations on abortion that do not contain any similar limiting language? *See, e.g.*, §§ 253.095, 48.257, 48.375, 20.927. In any event, the provisions that do contain that limiting language were all enacted after § 940.15. For that reason, we conclude that they are better understood as an effort to avoid conflict with the far less restrictive provisions of § 940.15, rather than an effort to protect § 940.04(1) against an implied repeal.[17]

¶33    In the end, the comprehensive nature of the last 50 years of legislation about abortion and the incompatibility of those laws with a near-total ban on abortion in § 940.04(1) persuades us that this is the rare situation in which Plaintiffs have overcome the strong presumption against implied repeal.[18] Implied repeal is disfavored for good reason, as it runs contrary to the assumption that the legislature acts with full knowledge of the existing law, and allows the court to do what the legislature did not do expressly: repeal a statute. *See Gonnelly*, 173 Wis. 2d at 513. But when, as here, the legislature enacts comprehensive legislation that "revise[s] the entire subject to which it relates," complete with "elaborate inclusions and exclusions of the persons, things and

---

[17] Additionally, we note that if Urmanski's theory were correct, it would transform § 940.04(1) into something the legislature never passed: a trigger law. *See, e.g.*, KY. REV. STAT. ANN. § 311.772(2); MO. ANN. STAT. § 188.017.

[18] For this reason, we also reject Urmanski's reliance on *State v. Grandberry*, 2018 WI 29, ¶21, 380 Wis. 2d 541, 910 N.W.2d 214. In that case, the defendant argued that a conflict existed between Wisconsin's safe-transport-of-firearms statute and its concealed-carry statute. *See* WIS. STAT. §§ 167.31(2)(b)1., 941.23(2). As the court correctly concluded, there was no conflict because those statutes imposed different requirements on individuals carrying firearms that could both be given simultaneous effect. *See Grandberry*, 380 Wis. 2d 541, ¶21. Here, by contrast, giving effect to a near-total ban on abortion in § 940.04(1) would render meaningless the last 50 years of comprehensive legislation about virtually every aspect of abortion including where, when, and how health-care providers may lawfully perform abortions. In other words, there is "no way to enforce both sets of laws" at issue in this case, and accordingly we must conclude that the legislature impliedly repealed § 940.04(1) as to abortion. *See McCorvey*, 385 F.3d at 849.

relationships ordinarily associated with the subject," we must conclude that it impliedly repealed an earlier law that would render those laws all but meaningless. *See Wisth*, 52 Wis. 2d at 589 (quoting another source).

IV

¶34    In conclusion, this case is about giving effect to 50 years' worth of laws passed by the legislature about virtually every aspect of abortion including where, when, and how health-care providers may lawfully perform abortions. The legislature, as the peoples' representatives, remains free to change the laws with respect to abortion in the future. But the only way to give effect to what the legislature has actually done over the last 50 years is to conclude that it impliedly repealed the 19th century near-total ban on abortion, and that § 940.04(1) therefore does not prohibit abortion in the State of Wisconsin.

*By the Court.*—The judgment and order of the circuit court is affirmed.

JILL J. KAROFSKY, C.J., concurring.

¶35     "To allow a State to exert control over one of 'the most intimate and personal choices' a woman may make is not only to affect the course of her life, monumental as those effects might be. . . . It is to alter her 'views of [herself]' and her understanding of her 'place[] in society' as someone with the recognized dignity and authority to make these choices." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 409 (2022) (Breyer, Sotomayor, Kagan, JJ., dissenting) (alteration in original) (quoting *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 851 (1992)).

¶36     WISCONSIN STAT. § 940.04,[1] the statute at issue in this case, prohibits abortion from conception to birth, according to District Attorney Urmanski. Under his reading, the state may exert total control over one of the most intimate and personal decisions a woman may make. His interpretation strips women and pregnant people of the dignity and authority to make intimate and personal choices by exposing medical professionals who perform abortions to 15-year prison terms. There are no exceptions for rape, incest, fetal abnormality, or the health of the mother. Urmanksi's interpretation means a 12-year-old girl who is sexually assaulted by her father and becomes pregnant must carry that pregnancy and endure childbirth. It means that a pregnant person carrying a fetus diagnosed with fatal anencephaly must carry the pregnancy to term, knowing the baby will endure an excruciating and short life. And it means that a woman hemorrhaging from a placental abruption cannot receive abortion care until or unless it is an objective certainty that she is facing death—a certainty that may arrive too late to save her life. This is the world gone mad.

---

[1] WIS. STAT. § 940.04    Abortion.
(1)  Any person, other than the mother, who intentionally destroys the life of an unborn child is guilty of a Class H felony.
(2)  Any person, other than the mother, who does either of the following is guilty of a Class E felony:
  (a) Intentionally destroys the life of an unborn quick child; or
  (b) Causes the death of the mother by an act done with intent to destroy the life of an unborn child. It is unnecessary to prove that the fetus was alive when the act so causing the mother's death was committed.
. . . .

¶37    I agree with the majority's decision and its analysis. In deciding that the legislature impliedly repealed WIS. STAT. § 940.04(1), the women and children of our state are shielded from the brutal consequences this statute wrought. Yet I write separately because when courts are called upon to arbitrate significant issues in turbulent times such as these, it is incumbent that we pause to reflect on the import of our decisions in the arc of history.

¶38    I begin with an examination of the history of abortion in the United States. In doing so, I highlight the impact of the U.S. Supreme Court landmark decisions of *Roe v. Wade* 410 U.S. 113 (1973), and *Dobbs v. Jackson Women's Health* on pregnant people. I conclude by elevating the accounts of four women to illustrate the real-world consequences of severe abortion restrictions. I hold these tragedies up to the light in the hope that Wisconsin's legacy may remain on the side of history that values the health and well-being of all people.

## I.   HISTORY OF ABORTION IN THE UNITED STATES

¶39    During our country's founding, abortions were widely available. In colonial America, prior to quickening (that vague point in gestation at which a woman or physician recognized fetal movement) abortions were commonplace and unquestioned.[2] Abortion practices at that time were referred to as "removing a blockage" or "restoring the menses" because the purpose of the procedure was to reestablish the body's natural state of monthly menstruation. The practice also disrupted the growth of a fetus, but the primary focus was to maintain the health of the mother.[3]

¶40    The general sentiment of the time was that women who were not enslaved had complete autonomy over the decision to obtain an

---

[2] Samuel W. Buell, *Criminal Abortion Revisited*, 66 N.Y.U. L. REV. 1774, 1780–82 (1991).

[3] JAMES C. MOHR, ABORTION IN AMERICA: THE ORIGINS AND EVOLUTION OF NATIONAL POLICY, 1800–1900, 4 n.2 (1979); LESLIE REAGAN, WHEN ABORTION WAS A CRIME: WOMEN, MEDICINE, AND THE LAW IN THE UNITED STATES, 1867–1973, 8–9 (1997).

abortion.[4] As such, health care providers offered services and products that facilitated abortions, advertising pills "particularly suited to married ladies" that induced periods, as well as services for women "who wish to be treated for obstruction of the monthly period."[5] Abortifacients, substances known to end pregnancies, were openly sold in stores and door-to-door. They, like feminine hygiene products, were treated as entirely unrelated to ideological or religious beliefs.[6] Importantly, a range of professionals, including midwives, homeopaths, pharmacists, and physicians, offered these services and products.

¶41 This trend continued into the Nineteenth Century: abortion-related treatment was commonplace, usually under the purview of women medical providers, and recognized as being far safer than childbirth. Legal restrictions, to the extent they existed, focused on the latest stages of pregnancy.[7]

¶42 Wisconsin was no exception. In 1849, one year after statehood, Wisconsin adopted the common law post-quickening prohibition on abortion.[8] Otherwise, abortion was permitted for any

---

[4] Ryan Johnson, *A Movement for Change: Horatio Robinson Storer and Physicians' Crusade Against Abortion*, 4 JAMES MADISON UNDERGRAD. RSCH. J. 1, 15 (2017). Enslaved women were denied access to abortion; it was more profitable for slave owners to force pregnancies upon them, and enslave those children as well. Because our nation has a legacy of slavery, it is important to recognize that there is no one legal history of abortion that is shared by all women irrespective of race. *See generally* Halley Townsend, *Second Middle Passage: How Anti-Abortion Laws Perpetuate Structures of Slavery and the Case for Reproductive Justice*, 25 U. PA. J. CONST. 187 (2023).

[5] *See* Erin Blakemore, *The Criminalization of Abortion Began as a Business Tactic*: *Abortion Was Common During the 19th Century*, HIST. (May 28, 2025), https://www.history.com/news/the-criminalization-of-abortion-began-as-a-business-tactic.

[6] *Id.*

[7] Johnson, *supra* note 4, at 15.

[8] *See* 1849 A.B. 116; *see also* Madeline Kasper et al., *A Brief History of Abortion Laws in Wisconsin, Revised*, 6 LEG. REFERENCE BUREAU REP. 1 (rev. ed.

pregnant person who sought one. Triggered largely by physicians' desire to remove competing practitioners from the healthcare field, substantial changes to abortion access would soon arrive.[9]

¶43    Beginning in the 1840's and gaining steam in the 1850's, the U.S. was swept up in a physician-led crusade against abortion access.[10] The fight was amplified by professional animus toward female medical practitioners like midwives, many of whom were Black and Indigenous,[11] and the growing women's rights movement. At the helm of this crusade was Horatio Storer, a prominent obstetrician and one of the American Medical Association's (AMA) earliest members.[12] Storer believed a woman's biological role was to be a wife and mother (not a health practitioner). As a result, he argued that abortion, a service often provided by female health practitioners, amounted to murder. He further blamed abortions for the population decline of "native-born," White Americans.[13]

¶44    In his zeal, Storer saw no significance to the "quickening" stage of pregnancy, and made this clear in his efforts to completely curb all access to abortion. Moreover, Storer's rhetoric about abortions omitted accurate information about women's health and focused mainly on the *morality* of abortion. In 1857 Storer publicly called upon the medical profession to oppose abortion and to consider legislation that would limit the practice of abortion exclusively to fellow physicians. He labored to

---

2022),
https://docs.legis.wisconsin.gov/misc/lrb/lrb_reports/history_of_abortion_laws_6_4.pdf.

[9] Townsend, *supra* note 4, at 205–06.

[10] Nicola Beisel & Tamara Kay, *Abortion, Race, and Gender in Nineteenth-Century America*, 69 AM. SOCIO. REV. 498, 505–06 (2004).

[11] Townsend, *supra* note 4, at 203–04.

[12] *See* Blakemore, *supra* note 5.

[13] REAGAN, *supra* note 3, at 11.

convince physician-colleagues in every state to work toward banning abortions.[14]

¶45     Storer's efforts were successful. In Wisconsin, for example, a state senate clerk named Dr. Henry Brisbane wrote to Storer regarding his desire "to get a law passed by our Legislature" to prevent both birth control and abortion procedures.[15] Due at least in part to Brisbane's efforts, the all-male, 1858 Wisconsin legislature removed the word "quick" from the 1849 statute, thus prohibiting abortion at every stage of gestation.[16]

¶46     By the end of the 1800s, every single state had a statute criminalizing abortion. What began as AMA effort's to wrest control from female providers of abortifacients and care,[17] became a wide-sweeping ban. With only three exceptions—Arkansas, Mississippi, and North Carolina—abortion was prohibited at all phases of pregnancy.[18]

¶47     Yet abortions remained basic and necessary medical care for many women. These severe restrictions ushered in an era when abortion care, though still common, became secretive and deadly.[19] And women of

---

[14] *See* Beisel & Kay, *supra* note 10, at 498.

[15] Kasper, *supra* note 8, at 4.

[16] *Id*. at 3–4.

[17] Indeed, abortion restrictions were a means for male physicians to ensure control over women's bodies, and the AMA's exclusion of women and Black people from its ranks facilitated that control. *See* Townsend, *supra* note 4, at 207 (quoting Michele Goodwin, *The Racist History of Abortion and Midwifery Bans*, ACLU (July 1, 2020), https://www.aclu.org/news/racial-justice/the-racist-history-of-abortion-and-midwifery-bans).

[18] Buell, *supra* note 2, at 1784 n.43.

[19] *"She's Not Free": Doctors Reflect on a Pre-Roe World*, NAT'L WOMEN'S L. CTR. REP. 1 (Aug. 2018), https://nwlc.org/wp-content/uploads/2018/08/Roe-Report-Part-I-2.pdf ("As recently as the 1940s, more than 1,000 women died each year in the United States from unsafe abortion.").

color and women living in poverty suffered a disproportionate number of those deaths.[20]

¶48    In Wisconsin, despite some penalty changes, and the 1955 consolidation of the abortion-related statutes into WIS. STAT. § 940.04, the legislature's broad prohibition on abortion remained intact for well over a century. Then, the U.S. Supreme Court intervened.

## II.    *ROE* AND *DOBBS*

¶49    In 1973, the U.S. Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113, struck down WIS. STAT. § 940.04 and numerous other extreme abortion restrictions by declaring a constitutional right to abortions prior to fetal viability. In the wake of *Roe*, the Wisconsin legislature passed new statutes that heavily regulated access to, but permitted, abortion care (*see* WIS. STAT. § 970.15). And for almost 50 years Wisconsin preserved *some* access to abortion.

¶50    Then in 2022, the U.S. Supreme Court overturned *Roe* in *Dobbs v. Jackson Women's Health*, 597 U.S. 215, declaring that a constitutional right to abortion no longer existed, sending the issue of abortion back to state legislatures. The impact was cataclysmic, as many states forbade abortion access. Among the sobering post-*Dobbs* statistics, I point to just one: during the two-year period after that decision, in the 14 states with abortion restrictions similar to WIS. STAT. § 940.04, it has been estimated that rapists caused approximately 65,000 pregnancies.[21] Because only five of those 14 states have exceptions for pregnancies caused by rape, it has been further estimated that almost 59,000 of the individuals impregnated by rape could not receive abortion-related care in their state.

---

[20] *Id.*; *see also* Townsend, *supra* note 4, at 228 ("Half of all women seeking abortion in the U.S. live below the federal poverty level, which is about $12,000 a year for a woman living alone and $25,000 for a family of four.") (quotation omitted).

[21] Samuel L. Dickman et al., *Rape-Related Pregnancies in the 14 U.S. States with Total Abortion Bans*, JAMA INTERN. MED. (Jan. 24, 2024), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2814274.

¶51 Here in Wisconsin, the uncertainty as to whether WIS. STAT. § 940.04 was an abortion ban left victims of sexual assault and others seeking reproductive healthcare in limbo. Medical professionals all but ceased performing abortions for over a year.[22] And the indignity to victims did not stop there. Because the maximum potential penalty under § 940.04 exceeds the maximum potential penalty of some sexual assault crimes, a medical provider who provided abortion care to a sexual assault victim potentially faced several more years in prison, and twice the fine, than a perpetrator of sexual assault.[23]

¶52 Although some providers in Wisconsin have resumed abortion-related care, uncertainty regarding the legal landscape of abortion care remains. Such uncertainty has led to adverse outcomes because some women delay or avoid seeking reproductive care.[24] This is especially true for Wisconsin's racially marginalized populations. These populations already face barriers to medical care, resulting in appallingly high maternal mortality rates. For example, Black women in this state are one-and-a-half times more likely to face serious pregnancy complications compared to other groups,[25] and Native American women follow close

---

[22] *The Impact of Wisconsin Abortion Laws: What's the Evidence?*, UNIV. WIS. COLLAB. FOR REPROD. EQUITY, 2 (Feb. 2025), https://core.wisc.edu/wp-content/uploads/sites/1349/2025/02/Evidence-of-impact-of-WI-abortion-laws_Feb-2025.pdf.

[23] Specifically, violation of WIS. STAT. § 940.04(2) is a Class E felony, which is punishable by up to 15 years in prison and a $50,000 fine. *See* WIS. STAT. §§ 940.04(2), 939.50(3)(e). Yet third-degree sexual assault—prohibiting nonconsensual sexual intercourse—is a Class G felony, which is punishable by up to 10 years in prison and a $25,000 fine. *See* WIS. STAT. §§ 940.225(3), 939.50(3)(g).

[24] *Human Rights Crisis: Abortion in the United States After* Dobbs, HUM. RTS. WATCH, ¶22 (Apr. 18, 2023), https://perma.cc/GM3X-2K6A.

[25] *Wisconsin Data Resource: Severe Maternal Morbidity, 2016–2023*, 7 (Dec. 2024), https://www.dhs.wisconsin.gov/publications/p01125-2016-2023.pdf. As tragic, there is evidence that since *Dobbs* infant mortality has increased in states with severe abortion restrictions, with an 11% increase in deaths among infants who were Black, had congenital anomalies, or were born in southern states. Alison Gemmill et al., *U.S. Abortion Bans and Infant Mortality*, JAMA (Feb. 13,

behind, with the second highest rate of maternal mortality in Wisconsin.[26] The volatile legal status of abortion-related care has only exacerbated these entirely preventable inequalities.[27]

¶53    Extreme abortion restrictions impact medical providers as well, forcing them into impossible ethical dilemmas. Because many abortion restrictions are written with vague language, it is often clinically unclear when a provider can prioritize the life and safety of the pregnant person. How is a medical professional able to provide necessary care when a pregnancy complication might require intervention that could be a crime? She cannot: "Pregnant patients have 'become radioactive to emergency departments' in states with extreme abortion restrictions."[28]

### III.   WE HONOR THEIR STORIES AND THEIR LIVES

¶54    This forced paralysis has had real, deadly consequences. Although by no means representative of every tragedy, below are the stories of four women who lost their lives because they lived in states that severely restrict abortion care in a manner similar to Urmanski's interpretation of WIS. STAT. § 940.04.

---

2025), https://jamanetwork.com/journals/jama/fullarticle/2830298?guestAccessKey=b720 29ae-86e1-4152-b21b-996a42715af0. There has been "an estimated 478 excess infant deaths in the 14 states with bans during the months affected by bans." *Id.*

[26] *Wisconsin Data Resource*, *supra* note 25, at 7.

[27] One study estimated that a total abortion ban in the U.S. would increase the number of pregnancy-related deaths by 21% for all women and by 33% among Black women. Latoya Hill et al., *What Are the Implications of the Dobbs Ruling for Racial Disparities?*, WOMEN'S HEALTH POL'Y (Apr. 24, 2024), https://www.kff.org/womens-health-policy/issue-brief/what-are-the-implications-of-the-dobbs-ruling-for-racial-disparities/.

[28] Amanda Seitz, *Emergency Rooms Refused To Treat Pregnant Women, Leaving One To Miscarry in a Lobby Restroom*, ASSOCIATED PRESS (Apr. 19, 2024, 3:41 PM), https://apnews.com/article/pregnancy-emergency-care-abortion-supreme-court-roe-9ce6c87c8fc653c840654de1ae5f7a1c.

¶55     In Georgia, state law prohibits abortion beyond six weeks of pregnancy, with unclear exceptions only for the life and health of the mother or fetal anomalies. At least two women have died there because the law is imprecise and leaves health care workers uncertain regarding which health conditions and symptoms allow abortion care. In August of 2022, Amber Thurman, a 28-year-old Black mother, was pregnant. Amber visited a hospital because she was experiencing a treatable complication that is sometimes a side effect of an abortion pill. She was admitted to the hospital, but the medical staff declined to treat her for 20 hours out of concern that intervention would violate the law.[29] Without treatment, Amber developed sepsis and died.

¶56     Candi Miller, a Black woman who also lived in Georgia, suffered from multiple health conditions that made pregnancy a risk. When she became pregnant, Candi avoided health care because of Georgia's strict abortion prohibition and instead ordered an abortion pill online. She suffered a similar complication to Amber, and, hesitant to seek medical care, she endured severe pain in her bed at home, eventually dying from a lethal combination of painkillers.

¶57     In Texas, an abortion law passed in May 2021 that requires physicians to confirm the absence of a fetal heartbeat before abortion care is permitted. The exception to this prohibition, a "medical emergency," is undefined. Josseli Barnica, an immigrant from Honduras, was pregnant and living in Texas at that time. At 17 weeks of pregnancy, Josseli began to miscarry. Despite being hospitalized, confirmation that she was in the process of miscarrying, and the fact that the fetus was pressed against her dilated cervix, health care professionals declined to hasten the delivery because the fetus still had a heartbeat. She was told, "It would be a crime to give her an abortion."[30] Josseli endured 40 hours of labor before

---

[29] Kavitha Surana, *Abortion Bans Have Delayed Emergency Medical Care. In Georgia, Experts Say This Mother's Death was Preventable*, PROPUBLICA (Sept. 16, 2024, 5:00 AM), https://www.propublica.org/article/georgia-abortion-ban-amber-thurman-death.

[30] Cassandra Jaramillo & Kavitha Surana, *A Woman Died After Being Told it Would Be a "Crime" To Intervene in Her Miscarriage at a Texas Hospital*, PROPUBLICA (Oct. 30, 2024, 5:00 AM), https://www.propublica.org/article/josseli-barnica-death-miscarriage-texas-abortion-ban.

delivering the fetus. During her labor and delivery she received only pain medication and emotional support. Josseli died of sepsis three days later. An expert review of her hospital records showed that Josseli would have likely survived with a quicker intervention. Her story is not unique: rates of sepsis in Texas among miscarrying women have gone up by more than 50% since that state passed its near-total abortion ban.[31] And maternal mortality, otherwise decreasing nationally, has gone up by 33% in Texas since the ban.[32]

¶58     These women should all still be alive. Their deaths were not only preventable, they were foretold by the stories of other women from a century ago. One of those stories involved my own great-grandmother, Julia Cowan, who met the same fate in 1929. Living in Boston, Julia, a White woman, became pregnant with what would have been her fourth child. Desiring to end the pregnancy but having no access to the medical care necessary for an abortion, she took matters into her own hands and ultimately bled to death in a Boston hospital. Like so many others, she died because society did not recognize her as someone with the "dignity and authority to make these choices."

¶59     I join the majority because it aptly analyzes the law and explains why WIS. STAT. § 940.04 no longer applies to abortion in this state. And I tell the stories of Amber, Candi, Josseli, and my great-grandmother Julia to remind us that severe abortion restrictions operate like death warrants. Under such restrictions women, children, and pregnant people are denied life-saving medical care while medical professionals are forced to sit idly at their bedsides, unable to do their jobs. Extreme abortion restrictions revive a time in our history driven by misogyny and racism, divorced from medical science; it is a world that must be left behind. I respectfully concur.

---

[31] Lizzie Presser et al., *Texas Banned Abortion. Then Sepsis Rates Soared*, PROPUBLICA (Feb. 20, 2025, 5:00 AM), https://www.propublica.org/article/texas-abortion-ban-sepsis-maternal-mortality-analysis.

[32] *Id.*

ANNETTE KINGSLAND ZIEGLER, J., dissenting.

¶60    The majority opinion is a jaw-dropping exercise of judicial will, placing personal preference over the constitutional roles of the three branches of our state government and upending a duly enacted law. In this dangerous departure from our constitutional design, four members of the court make up and apply their own version of implied repeal, failing to hew to any semblance of traditional judicial decision-making or jurisprudence. Under the majority's more-than-novel approach, four members of the court scrub from the Wisconsin Statutes one abortion law, WIS. STAT. § 940.04(1), without ever identifying which legislative enactment in particular repealed it[1] and despite the fact that the legislature has recently amended § 940.04—twice[2]—and has referenced the statute in other enactments.[3] "Justice is supposed to be blind, but justice is not supposed to turn a blind eye to the obvious."[4] The majority's analysis is fundamentally flawed, and the majority is compromised when it comes to the issue of abortion.

¶61    Purporting to apply the doctrine of implied repeal, the majority picks and chooses which abortion statutes remain in force. The majority admits that there is no irreconcilable conflict between WIS. STAT. § 940.04(1) and any other statute (the first type of implied repeal); instead, the majority claims that the legislature passed legislation that was clearly

---

[1] *See* Justice Hagedorn's dissent, ¶126.

[2] 2001 Wis. Act 109, § 586 (modifying the punishment for violating WIS. STAT. § 940.04(1)); 2011 Wis. Act 217, § 11 (repealing § 940.04(3) and (4), which criminalized mothers performing or consenting to an abortion).

[3] 1997 Wis. Act. 295, § 12 (creating WIS. STAT. § 939.75, which says that certain feticide statutes do "not limit the applicability of [§] 940.04 . . . to an induced abortion"); 2015 Wis. Act 64, § 4 (creating WIS. STAT. § 968.26(1b)(a)2.a., which includes § 940.04(1) in the definition of "crime").

[4] *In re Judicial Disciplinary Proceedings Against Prosser*, 2012 WI 103, ¶7, 343 Wis. 2d 548, 817 N.W.2d 875 (opinion of Ziegler, J.).

meant as a substitute for § 940.04(1) (the second type of implied repeal).[5] The majority, however, fails to actually use and apply the doctrine of implied repeal. The doctrine of implied repeal requires that a court not declare a statute impliedly repealed unless there is no reasonable interpretation under which the statute survives.[6] The majority does not do the work required to demonstrate that there is no other reasonable interpretation of the enactments at issue in this case. Of course, more than one reasonable interpretation of the enactments exists, as is exemplified by Justice Brian Hagedorn's dissent.[7] The majority's smoke-and-mirrors legalese is nothing more than "'painting a mule to resemble a zebra, and then going zebra hunting. But paint does not change the mule into a zebra.'"[8] Those in the majority know better, but they do so anyway because they like the result and promised to deliver it.

¶62 Abortion invokes strong feelings and opinions. Depending on the lens with which one personally views abortion, different individualized positions may be reached. For example, personal philosophy or experience may yield one answer; insight derived from

---

[5] Majority op., ¶14; *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 328 (2012) ("The Supreme Court of the United States long ago announced that an implied repeal may occur in either of two circumstances: '(1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act.'" (quoting *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936))).

[6] *Gilkey v. Cook*, 60 Wis. 133, 139, 18 N.W. 639 (1884); *Ward v. Smith*, 166 Wis. 342, 344, 165 N.W. 299 (1917); *State ex rel. Thompson v. Beloit City Sch. Dist.*, 215 Wis. 409, 416, 253 N.W. 598 (1934); *McLoughlin v. Malnar*, 237 Wis. 492, 496, 297 N.W. 370 (1941); *Union Cemetery v. City of Milwaukee*, 13 Wis. 2d 64, 71, 108 N.W.2d 180 (1961).

[7] *See, e.g.*, Justice Hagedorn's dissent, ¶¶136-159.

[8] *State v. Allen*, 2010 WI 10, ¶259, 322 Wis. 2d 372, 778 N.W.2d 863 (Ziegler, J., concurring) (quoting *State ex rel. Arnold v. Cnty. Ct. of Rock Cnty.*, 51 Wis. 2d 434, 448, 187 N.W.2d 354 (1971) (Hansen, J., dissenting)).

medical practice may produce another; and biblical interpretation may bring forth yet another. Regardless of what might factor into an individual's opinion, that point of view can be deeply personal and complicated. Unlike the profoundly personal way in which we might determine our respective positions on abortion, that process is quite different from how a court is required to interpret the law. It is the court's duty to adhere to the law whether we "like" the answer or not.[9] A judge's personal preferences are not legal analysis and should not supplant it. Although people may strongly disagree about abortion, an objective review of the law of implied repeal must lead to the conclusion that the statute at issue has not been repealed by the legislature, expressly or impliedly.

¶63 For many, abortion is one of the most important issues of our time. It is "a profound moral issue on which Americans hold sharply conflicting views."[10] Both interests involved—the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life— "are extraordinarily weighty."[11] However, since the United States Supreme Court in *Dobbs v. Jackson Women's Health Organization*[12] overruled its prior decisions in *Roe v. Wade*[13] and *Planned Parenthood of Southeastern Pennsylvania v. Casey*,[14] among others, the Wisconsin Legislature has not legislated on the issue of abortion. This stands in sharp contrast with the legislative actions taken by the legislatures in other states, which have addressed the issue of abortion after the Court issued *Dobbs*.[15] The Wisconsin Legislature should clarify the statutes in light of *Dobbs* and have the debate, testimony, and dialogue that accompanies legislative

---

[9] Justice Rebecca Grassl Bradley's dissent, ¶77.

[10] *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 223 (2022).

[11] *Id.* at 337 (Kavanaugh, J., concurring).

[12] 597 U.S. 215.

[13] 410 U.S. 113 (1973).

[14] 505 U.S. 833 (1992).

[15] *See, e.g.*, 2023 W. Va. Acts 2547, 2561–63; 2023 Fla. Laws ch. 2023-21, § 4; 2023 Minn. Laws ch. 4, § 1.

action. Such legislative action, even if vetoed by the governor, serves the public, shaping public opinion and moving the issue to the fore. Current legislative inaction, however, is no excuse for judicial activism.[16]

¶64 As Justice Rebecca Grassl Bradley observes in her dissent, instead of following the law wherever it leads, the majority seizes for itself the role of the legislature: "In the face of impasse between the political branches, the majority removes the issue from the democratic process and chooses the law it prefers over the one it disdains."[17] Put bluntly, our court has no business usurping the role of the legislature, inventing legal theories on the fly in order to make four justices' personal preference the law. When the Court in *Dobbs* overruled *Roe* and *Casey*, it returned the question of abortion "to the people and their elected representatives."[18] The Court did not send the question of abortion policy to state courts to take over where it left off. Abortion policy is for the legislature to decide.

¶65 Courts are not constitutionally designed to react to public opinion,[19] but quite recently our court has been seen and used as an expedient vehicle for achieving results.[20] That is a grave mistake for the institution and an assault on the constitution. The issue before us presents a clear example of why it is the legislature's constitutional duty—not the court's—to react to the pulse of the public and enact laws consistent with public opinion as public opinion changes over time. Unlike our court, the legislature has the authority and power to react to public opinion: It may enact and repeal statutes,[21] craft a constitutional amendment,[22] or perhaps

---

[16] *See* Justice Rebecca Grassl Bradley's dissent, ¶76.

[17] *Id.*, ¶77.

[18] *Dobbs*, 597 U.S. at 259.

[19] *See* Justice Rebecca Grassl Bradley's dissent, ¶76.

[20] *See, e.g., Clarke v. WEC*, 2023 WI 79, 410 Wis. 2d 1, 998 N.W.2d 370; *Priorities USA v. WEC*, 2024 WI 32, 412 Wis. 2d 594, 8 N.W.3d 429.

[21] WIS. CONST. ART. IV, §1 (providing "[t]he legislative power shall be vested in a senate and assembly"); *Schmidt v. Dep't of Res. Dev.*, 39 Wis. 2d 46, 59, 158 N.W.2d 306 (1968) (stating the power vested in the legislature includes "'[t]he power to declare whether or not there shall be a law; to determine the

even consider a public referendum. Unlike our court, the legislature can hear from, and take account of, varied points of view when developing legislation. The legislature can hold hearings to vet different policy proposals and consult experts. If the public does not like the legislative results, it has recourse through the electoral process, which, by constitutional design, happens far more frequently than that in the judicial branch.[23] Although the seven members of this court are elected officials,[24] they are not elected "representatives" of the people.[25] The legislature "alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences."[26]

¶66     Our constitution, which vests the legislature with the power to make the law, assumes that the judicial branch will act with restraint. The judicial branch is supposed to be the least dangerous branch of government.[27] But when a statute is repealed by judicial fiat, as has been done here, the constitution's design is undone. The supreme court of our state is not the proper vehicle for enacting the will of the people. Judges

---

general purpose or policy to be achieved by the law; [and] to fix the limits within which the law shall operate'" (quoting *State ex rel. Wis. Inspection Bureau v. Whitman*, 196 Wis. 472, 505, 220 N.W. 929 (1928))); *D.C. v. John R. Thompson Co.*, 346 U.S. 100, 114 (1953) (stating "[t]he repeal of laws is as much a legislative function as their enactment").

[22] *See* WIS. CONST. ART. XII, § 1 (constitutional amendments).

[23] *Compare* WIS. CONST. ART. IV, §§ 4 (providing that representatives to the assembly are elected to serve two-year terms), *and* 5 (providing that senators are elected to serve four-year terms), *with* WIS. CONST. ART. VII, § 4(1) (providing that justices of the supreme court are elected to serve ten-year terms).

[24] *See* WIS. CONST. ART. VII, § 4(1) (supreme court elections).

[25] *See* Justice Rebecca Grassl Bradley's dissent, ¶77.

[26] *Wis. Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018).

[27] *See* THE FEDERALIST NO. 78, at 523 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

are not "merely legislators in black robes[,]"[28] and the court's role of interpreting the law ought not to be turned into "politics pursued by other means."[29] Particularly with politically and emotionally charged issues—like abortion—the court should be extremely mindful to ensure that it hews to its duty to exercise restraint. Instead of giving in to the temptation to provide a particular result, as my colleagues do here, the court should be exacting and apply sound legal analysis. Today's decision may be popular, but the result comes at great cost to the constitution and the rule of law.

¶67    Our court is particularly ill-equipped to decide the issue of abortion. Our court should not, and particularly this majority should not, decide the issue because Justices on this court have—very recently—publicly made their views regarding abortion known.[30] Some have

---

[28] Suzanna Sherry, *Democracy's Distrust: Contested Values and the Decline of Expertise*, 125 HARV. L. REV. F. 7, 11 (2011).

[29] J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253, 267 (2009).

[30] *See* WIS. STAT. § 757.19(2)(g) (providing that a "judge shall disqualify himself or herself from any civil or criminal action or proceeding" if "he or she cannot, or it appears he or she cannot, act in an impartial manner"); SCR 60.04(4)(f) (providing that recusal is required if "[t]he judge, while a judge or a candidate for judicial office, has made a public statement that commits, or appears to commit, the judge with respect to" "[a]n issue in the proceeding" or a "controversy in the proceeding").

During her campaign in 2023, then-Judge Protasiewicz expressed her support for abortion rights repeatedly. She called the law at the heart of this case "draconian" and decried the idea that the law might stay in place. *What Janet Protasiewicz says about her abortion views*, MILWAUKEE J. SENTINEL (Mar. 24, 2023), https://www.jsonline.com/story/news/politics/elections/2023/03/17/wisconsin-supreme-court-candidate-janet-protasiewicz-talks-abortion-catholic-youth-election-april-4/70009272007/. She also "indicated a 20-week ban on abortions 'is probably constitutional.'" *Planned Parenthood of Wis. v. Urmanski*, No. 2024AP330-OA, unpublished order, at 9 (Wis. July 2, 2024) (Rebecca Grassl Bradley, J., dissenting) (quoted source omitted). It should come as no surprise that after today's decision the earliest abortion prohibition is a 20-week ban. *See* WIS. STAT. § 253.107(3). As Justice Rebecca Grassl Bradley notes in her dissent, the other

promised the result delivered with this opinion. While the expediency of this result might be quite satisfactory to many, it is not the constitutional role of the court to deliver results in order to please a particular constituency. But these important principles have been cast aside. It seems that because four members of this court wish to strike WIS. STAT. § 940.04(1) from the statute books—however flimsy the legal justification may be—the majority trudges on.

¶68 We should not be stepping in to legislate on the subject. To be clear, if we did not address the issue and provide an answer, the public would still have recourse through the legislature. As a practical matter, it is quite common for a court to not answer questions presented to it, no matter how much the answer may be desired. In fact, we deny more petitions for review (or petitions for bypass) than we grant. And even when we grant such petitions, we sometimes determine that an answer to the question presented will not be provided.[31] Any number of legal technicalities could preclude a litigant from getting the relief requested. For example, a procedural issue may preclude the case from being heard. A case may not be heard because it is time barred, no matter how seemingly unfair or unsatisfying it may be to those requesting that the court decide the matter.[32] Simply stated, there are a number of reasons why we might not decide a case, including if we lack a quorum.

---

justices in the majority also made statements indicating how they vote in this case or endorsed then-Judge Protasiewicz. Justice Rebecca Grassl Bradley's dissent, ¶77.

[31] *See, e.g., Amazon Logistics, Inc. v. LIRC*, 2024 WI 15, 411 Wis. 2d 166, 4 N.W.3d 294 (per curiam); *Winnebago County. v. D.E.W.*, 2024 WI 21, 411 Wis. 2d 673, 5 N.W.3d 850 (per curiam); *State v. Jackson*, 2023 WI 37, 407 Wis. 2d 73, 989 N.W.2d 555 (per curiam). The court has sometimes dismissed cases that are properly before the court, which present questions the court ought to address. *See Van Oudenhoven v. DOJ*, 2025 WI 25, ___ Wis. 2d ___, ___ N.W.3d ___ (per curiam).

[32] *See Fleming v. Amateur Athletic Union of U.S., Inc.*, 2023 WI 40, ¶16, 407 Wis. 2d 273, 990 N.W.2d 244.

* * *

¶69     The result the majority imposes on the whole State of Wisconsin will—no doubt—be applauded by many across the state who view WIS. STAT. § 940.04(1) as a relic from a bygone era. Today's opinion will be touted as a great victory for abortion access in the press and beyond. "But before popping the champagne on [this court's] latest edict,"[33] one should pause and ask what price has been paid for today's decision: the people of Wisconsin's ability to democratically decide for themselves what the laws of the state shall be, the separation of powers between the branches of our state government, and this court's credibility as a neutral judicial body—to name but a few of the costs. Those who "win" today may like the result, but an activist court—*whether liberal or conservative*—endangers the rule of law and offends the constitution.

¶70     An important and divisive issue such as abortion deserves well-reasoned judicial decision-making, not legislating under the guise of a judicial opinion. While I am disappointed with my colleagues' decision to legislate their personal policy preferences from the bench and cast aside the constitutionally prescribed role of the court, considering this court's recent decisions,[34] this sadly comes as no surprise.

¶71     For the foregoing reasons, I dissent.

---

[33] Wilkinson, *supra*, at 257.

[34] *See supra* note 19.

REBECCA GRASSL BRADLEY, J., dissenting.

¶72    [I]f the policy of the Government upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made . . . the people will have ceased to be their own rulers, having . . . practically resigned their Government into the hands of that eminent tribunal.

Abraham Lincoln's First Inaugural Address, 1861.[1]

¶73    The majority erases a law it does not like, making four lawyers sitting on the state's highest court more powerful than the People's representatives in the legislature. Any remaining doubt over whether the majority's decisions are motivated by the policy predilections of its members has been extinguished by its feeble attempt to justify a raw exercise of political power.[2] The majority not only does violence to a single statute; it defies the People's sovereignty.

¶74    Not content with effacing the law, Chief Justice Jill Karofsky rewrites history, erases and insults women by referring to mothers as "pregnant people," slanders proponents of the pro-life perspective, and broadcasts dangerously false narratives about laws restricting abortion. Laden with emotion, steeped in myth, and light on the law, the concurrence reads as a parody of progressive politics rather than the opinion of a jurist.

¶75    Offering only policy considerations, the concurrence obscures what this case actually concerns. This case was never about what abortion policy *should be*. It was always about *who decides*. Chief Justice Karofsky makes an emotional appeal for amending Wisconsin's abortion law. Her arguments belong in the legislature, which is equipped (and authorized) to debate the issue, sift through statistics and stories (the

---

[1] 6 JAMES D. RICHARDSON, A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS, 1789–1897, at 9 (1897).

[2] Justice Brian K. Hagedorn's dissent dismantles the majority's theory of implied repeal. I join his dissent and will not repeat the analysis.

suspect along with the valid), and enact a policy reflecting the will of the People.

¶76    In the face of impasse between the political branches, the majority removes the issue from the democratic process and chooses the law it prefers over the one it disdains. Chief Justice Karofsky's concurrence unveils the nature of the majority's decision in this case; it isn't judicial. The majority seeks to reverse what it considers the "cataclysmic" impact of the United States Supreme Court's recognition in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) that the United States Constitution says nothing about abortion and leaves the issue to be decided by the People.[3] Concurrence, ¶50.

¶77    While political polls reveal the voting public prefers legal abortion, judges are not supposed to be responsive to polls—unlike the legislature and the governor. Judges are supposed to follow the law whether they like it or not, and leave the policy making to the political branches. Abandoning venerable judicial norms of neutrality, the members of the majority render decisions in accordance with the "values" they espoused on the campaign trail. Justice Janet Protasiewicz declared her support for abortion and her disdain for the law she now overturns.[4] During Justice Protasiewicz's campaign, then-Justice Karofsky said, "Everything that Wisconsinites care about is on the line in this election, from *abortion rights* . . . to the 2024 election . . . ."[5] Justices Ann Walsh Bradley and Rebecca Frank Dallet endorsed Justice Protasiewicz,

---

[3] The concurrence laments the Supreme Court's "cataclysmic" decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), but the number of abortions in the United States has actually *increased* since *Dobbs* returned the abortion issue to the individual states. *See* Claire Cain Miller and Margot Sanger-Katz, *Abortions Have Increased, Even for Women in States with Rigid Bans, Study Says*, N. Y. TIMES (Oct. 22, 2024), https://www.nytimes.com/2024/10/22/upshot/abortions-rising-state-bans.html. The real cataclysm affects individuals for whom the concurrence expresses no concern.

[4] Justice Ziegler's dissent, ¶8 n.30.

[5] *Here and Now: Jill Karofsky on the 2023 Wisconsin Supreme Court Election*, PBS (Mar. 31, 2023), https://www.pbs.org/video/jill-karofsky-2023-wisconsin-supreme-court-election-kfmm4v/ (emphasis added).

embracing her rejection of the rule of law in favor of their own will. All four silenced pro-life advocates in a companion case challenging the constitutionality of Wisconsin's abortion law. *Planned Parenthood of Wisconsin v. Urmanski*, No. 2024AP330-OA, unpublished order (Wis. July 2, 2024) (denying motion to intervene from Wisconsin Right to Life, Wisconsin Family Action, and Pro-Life Wisconsin).

¶78    Voters may be impatient with the political impasse between the governor (a Democrat) and the legislature (majority Republican)—on this issue and perhaps others. Electing justices who fancy themselves super legislators, however, comes at a steep price. The People of Wisconsin have surrendered self-governance to four liberal lawyers. No one, regardless of political leanings, should want *any* four lawyers to make all of the important decisions for we the People—absent debate, discussion, or compromise. The constitution doesn't allow it. In America, the Law is King.[6] The majority of this court has deposed the Law. There is no greater affront to democracy. There is no greater threat to our Republic. I dissent.

I

¶79    "The struggle over the stories we tell ourselves about abortion inevitably has become in part a struggle to control the history of abortion." JOSEPH W. DELLAPENNA, DISPELLING THE MYTHS OF ABORTION HISTORY 12 (rev. ed. 2023).

¶80    The history of abortion has no relevance to the statutory interpretation question the parties present. The kind of revisionist history permeating the concurrence, however, bears a veneer of accuracy solely because it exists in a judicial opinion. When the legend becomes "fact," the media, and sometimes legal commentators, print the legend, and the truth becomes forgotten.[7] While the concurrence has nothing to do with the law, allowing it to stand without refutation would be an affront to the truth.

---

[6] THOMAS PAINE, COMMON SENSE (1776), *reprinted in* COMMON SENSE, RIGHTS OF MAN, AND OTHER ESSENTIAL WRITINGS OF THOMAS PAINE 3, 38 (2003).

[7] *See* THE MAN WHO SHOT LIBERTY VALANCE (Paramount Pictures 1962).

¶81 Citing discredited sources, Chief Justice Karofsky claims "abortions were widely available" in colonial America and women had "complete autonomy over the decision to obtain an abortion." Concurrence, ¶¶39–40. Neither assertion is true. "English law regarding abortion was fully received in the colonies, and [] the purported 'common law liberty' to abort is a myth."[8] As the United States Supreme Court documented in *Dobbs*, "an unbroken tradition of prohibiting abortion on pain of criminal punishment persisted from the earliest days of the common law until 1973." 597 U.S. at 250.

¶82 Until *Roe v. Wade*, "there existed a near millennium of statements in the historical record that condemned abortion" with only two discredited sources—dating from 1285–1292—suggesting abortion was not a crime.[9] In *The Mirror of Justices*, lawyer Andrew Horn asserted "abortion cannot be homicide because 'no one can be adjudged an infant until he has been seen in the world so that it may be known whether he is a monster or no[,]'"[10] a sentiment which, as two legal scholars put it, "reeks of either superstition or bias toward disabled persons."[11] Nineteenth century English legal historians described Horn's work as "so

---

[8] JOSEPH W. DELLAPENNA, DISPELLING THE MYTHS OF ABORTION HISTORY 228 (rev. ed. 2023) (citations omitted); *see also Dobbs*, 597 U.S. at 242 ("The 'eminent common-law authorities (Blackstone, Coke, Hale, and the like),' *all* describe abortion after quickening as criminal." (citation omitted)); *id.* at 260 ("The dissent is very candid that it cannot show that a constitutional right to abortion has any foundation, let alone a 'deeply rooted' one, 'in this Nation's history and tradition.'" (citation omitted)); John Finnis & Robert P. George, *Equal Protection and the Unborn Child: A* Dobbs *Brief*, 45 HARV. J.L. & PUB. POL'Y 927, 933 (2022) ("[A]t common law, century after century, any elective abortion engaged three indictable offences, three types of homicide.").

[9] Skylar Reese Croy & Alexander Lemke, *An Unnatural Reading: The Revisionist History of Abortion in* Hodes v. Schmidt, 32 U. FLA. J.L. & PUB. POL'Y 71, 90–91 (2021).

[10] *Id.* at 91 (quoting ANDREW HORN, THE MIRROR OF JUSTICES (attributed to Andrew Horn) (approximately 1285), *reprinted in* 7 SELDEN SOC'Y 139 (William Joseph Whittaker ed., 1895)).

full of fables and falsehoods that as an authority it is worthless."[12] The other source may be disregarded as simply wrong on the legal procedure for prosecuting the crime.[13]

¶83    English common law unvaryingly treated abortion as a crime. Current scholarship verifies "that by the close of the seventeenth century, the criminality of abortion under the common law was well established. Courts had rendered clear holdings that abortion was a crime, no decision indicated that any form of abortion was lawful, and secondary authorities similarly uniformly supported the criminality of abortion."[14] After reviewing the historical record, the United States Supreme Court concluded, "although common-law authorities differed on the severity of punishment for abortions committed at different points in pregnancy, none endorsed the practice. Moreover, we are aware of no common-law case or authority, and the parties have not pointed to any, that remotely suggests a positive *right* to procure an abortion at any stage of pregnancy." *Dobbs*, 597 U.S. at 245.

¶84    William Blackstone summarized prevailing public sentiment in the 18th century on the subject of abortion; while society had softened its ancient condemnation of the practice, it nonetheless treated abortion as a crime:

> Life is the immediate gift of God, a right inherent by nature in every individual, and it began in contemplation of law as soon as an infant was able to stir in the mother's womb. For if a woman is quick with child, and by a potion or otherwise, killeth in her womb, or if anyone beat her whereby the child dieth in her body, and she is delivered of a dead child; this, though not murder, was by the ancient law homicide or manslaughter. But the modern law doth not look upon this

---

[11] *Id*. at 91 n.126.

[12] *Id.* (citing JOSEPH W. DELLAPENNA, DISPELLING THE MYTHS OF ABORTION HISTORY 133 (2006) (quoting FREDERICK POLLOCK & FREDERICK MAITLAND, 2 HISTORY OF ENGLISH LAW BEFORE EDWARD I 478 n.1 (2d ed. 1898))).

[13] *Id.*

[14] DELLAPENNA, *supra* note 8, at 200.

offence in quite so atrocious a light, but merely as a heinous misdemeanor.[15]

The meaning and relevance of "quickening" and "quick with child" have been obscured by linguistic misunderstanding. In 1861, Francis Wharton explained that neither "medical experience" nor the common law provide any evidence of abortion prohibitions being applied only after quickening, giving the term its commonly assigned meaning of the child's movement being felt in the womb.[16] Legal scholar Philip Rafferty's research reveals the phrase "quick with child" simply meant the mother was pregnant with a living child.[17]

¶85    The concurrence promotes the theory that abortion was permissible up to the point of "quickening," until male physicians—with anticompetitive (if not racist) motives—successfully lobbied legislatures across America to ban it altogether in the nineteenth century. Concurrence, ¶43–46. The English common law's treatment of abortion reflects the primitive state of medical technology during that era, which precluded proof of pregnancy until several months after conception.[18] In

---

[15] *Id.* at 238–239 (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *129–30 (1765)); *see also Dobbs*, 597 U.S. at 243.

[16] DELLAPENNA, *supra* note 8, at 238 (quoting 1 FRANCIS WHARTON, THE CRIMINAL LAW OF THE UNITED STATES § 1220 (5th rev. ed 1861)); *see also Dobbs*, 597 U.S. at 243–44 (discussing the criminalization of pre-quickening abortions under the common law (citations omitted)).

[17] DELLAPENNA, *supra* note 8, at 139 (citing 1 PHILIP RAFFERTY, *ROE V. WADE*: THE BIRTH OF A CONSTITUTIONAL RIGHT 64–76, 116–19, 136–86 (University Microfilms International Dissertation Information Service, Ann Arbor, MI 1992)). At most, "quick with child" could have described: "(1) a pregnant woman, (2) a woman who is pregnant with a live child, and (3) a pregnant woman who, because she has experienced quickening, knows that she is, or is known to be, pregnant with a live child." *See* PHILIP RAFFERTY, *ROE V. WADE*: THE BIRTH OF A CONSTITUTIONAL RIGHT 176 (1992).

[18] DELLAPENNA, *supra* note 8, at 191 (citations omitted); *see also* Robert A. Destro, *Abortion and the Constitution: The Need for a Life-Protective Amendment*, 63 CAL. L. REV. 1250, 1255 n.27 (1975) ("Quickening was chosen [in the framing of abortion policy] by the early common law as an interim point because it

light of the limited medical understanding at the time, a careful reading of the historical record reveals the concept of quickening was not based on some progressive pro-abortion view held by founding-era Americans, but rather developed from ignorance of when life began.[19]

¶86 Justice Caleb Stegall's dissent in *Hodes v. Schmidt* discusses a similar misreading of history by a majority of justices on the Kansas Supreme Court:

> Reading today's majority opinion is a follow-the-white-rabbit experience. One is left feeling like Alice, invited by the Queen to believe "'as many as six impossible things before breakfast.'" Carroll, Through the Looking-Glass 100 (1899). Indeed, the story told by the majority is a strange one. In it, all the luminaries of the western legal tradition—from Sir Edward Coke and William Blackstone to Edmund Burke and Thomas Jefferson—would celebrate and enshrine a right to

---

represented the first concrete proof that the child was alive." (citing *State v. Cooper*, 22 N.J.L. 52 (1849))); *Dobbs*, 597 U.S. at 246 ("The original ground for drawing a distinction between pre- and post-quickening abortions is not entirely clear, but some have attributed the rule to the difficulty of proving that a pre-quickening fetus was alive.").

[19] *See Dobbs*, 597 U.S. at 246–47; *cf.* DELLAPENNA, *supra* note 8, at 21. Dellapenna criticizes James Mohr's book, ABORTION IN AMERICA, which makes a similar logical blunder as the concurrence. As Dellapenna explains, Mohr posits "the quickening distinction sometimes applied in the common law demonstrates that people did not believe that killing a living fetus at any time was wrong even while acknowledging that women at the time considered the pre-quickening fetus to be 'inert non-beings.'" *Id*. at 21–22 (citing JAMES MOHR, ABORTION IN AMERICA: THE ORIGINS AND EVOLUTION OF NATIONAL POLICY, 1800–1900, at 4–10 (1978)). While the concurrence claims abortion prior to quickening was commonplace, it makes no attempt to grapple with why that may have been the case. The founding era did not feature, as the concurrence selectively portrays it (in this context only), a progressive society that treated abortion "as entirely unrelated to ideological or religious beliefs." Concurrence, ¶40. With a more rudimentary understanding of medical science, founding era physicians likely considered "quickening" "to signal that a fetus had become a *living* human person." DELLAPENNA, *supra* note 8, at 751 (emphasis added).

nearly unfettered abortion access. In this imagined world, the Liberty Bell rings every time a baby *in utero* loses her arm.

440 P.3d 461, 517 (Kan. 2019). In the real world of colonial America, James Wilson, "a key founding father, natural law scholar, and one of the first justices to sit on the U.S. Supreme Court,"[20] summarized the actual law governing abortion in the 18th century, which bears no resemblance to the world imagined by the concurrence:

> With consistency, beautiful and undeviating, human life, from its commencement to its close, is protected by the common law. In the contemplation of law, life begins when the infant is first able to stir in the womb. By the law, life is protected not only from immediate destruction, but from every degree of actual violence, and, in some cases, from every degree of danger.[21]

The strange stories told in *Hodes* and repeated by the concurrence in this case have been decisively debunked by legal scholars and historians alike.[22]

¶87　While relevant court records from colonial America are scarce, the available evidence refutes Chief Justice Karofsky's claim that abortions were "widely available" and "prior to quickening" were "commonplace and unquestioned." Concurrence, ¶39. In his exhaustive treatise on the history of abortion, Professor Joseph W. Dellapenna documents existing court records from the colonial era detailing the prosecution of acts of abortion. In *Commonwealth v. Mitchell*,[23] a Maryland

---

[20] Croy & Lemke, *supra* note 9, at 74.

[21] James Wilson, Of the Natural Rights of Individuals, Lecture on Law (1790), *in* 2 THE WORKS OF THE HONOURABLE JAMES WILSON 453, 475 (1804).

[22] *See, e.g.*, DELLAPENNA, *supra* note 8; Croy & Lemke, *supra* note 9.

[23] 10 ARCHIVES OF MARYLAND: JUDICIAL AND TESTAMENTARY BUSINESS OF THE PROVINCIAL COURT 1649/50–1657, at 182 (1891).

case from 1652, the defendant—a married man—was charged with forcing his mistress, Susan Warren, to ingest a substance after she disclosed her pregnancy. Mitchell was indicted for having "endeavored to destroy or Murther the Child by him begotten in the Womb."[24] During her deposition, Warren said of her pregnancy that "it was a great sin to get it, but a greater to make it away."[25]

¶88    In *Rex v. Hallowell*,[26] a Connecticut doctor was indicted after performing an abortion that caused the gruesome death of both a mother and her child in 1742. After the "potion" Hallowell provided to induce abortion failed, Hallowell performed a "manual operation," to which the mother consented only after Hallowell told her she would otherwise die.[27] Two days later, the mother delivered a "hurt and decaying" child; one month later, the mother died after suffering a fever, delirium, and convulsions.[28] A grand jury indicted Hallowell for attempting to destroy the mother's "health" and "the fruits of her womb."[29]

¶89    The laws of New York also criminalized abortion. A 1716 New York municipal ordinance prohibited midwives from performing or facilitating abortions for their patients: "You [midwives] Shall not Give any Counsel or Administer any Herb Medicine or Potion, or any other

---

[24] DELLAPENNA, *supra* note 8, at 216 (quoting 10 ARCHIVES OF MARYLAND, *supra* note 23).

[25] *Id.* at 219 (quoting 10 ARCHIVES OF MARYLAND, *supra* note 23, at 176).

[26] *Id.* at 221 (citing 9 SUPER. CT. RECORDS NOS. 113, 173, 175 (Wyndham Cnty., Conn., Super. Ct. Files, box 172) (1745–47)); *see also* Cornelia Hughes Dayton, *Taking the Trade: Abortion and Gender Relations in an Eighteenth-Century New England Village*, 48 WM & MARY Q. 19, 19 (1991).

[27] DELLAPENNA, *supra* note 8, at 221–23.

[28] *Id.*

[29] *Id.* at 223.

thing to any Woman being with Child whereby She Should Destroy or Miscarry of that she goeth withall before her time."[30]

¶90    "A final confirmation of the reality that abortion was not only generally condemned and illegal, but that abortion was also a rare event in American society is found in the diary of midwife Martha Ballard."[31] In her diary, Ballard details her decades-long career as a midwife from 1785–1812 and refers to many instances of incest, illegitimacy, and child abuse, but not a single abortion.[32] Either Ballard regarded abortion as too vile to mention despite vividly describing other disturbing events, or she never performed or encountered the practice.[33] Given the prevailing proscription of abortion in colonial America, it was likely the latter.

¶91    An 18th century jurist, James Parker, authored "one of the few secondary sources on the common law as applied in any American colony," summarizing the common law on abortion as applied in New York:

> If a physician or surgeon give a person a potion, without any intent of doing him any bodily harm, but with intent to cure or prevent a disease, and contrary to the physician or surgeon's expectation it kills him, this is no homicide. . . . But if a woman be with child and any gives her a [potion] to destroy the child within her, and she takes it, and it works so strongly that it kills her, this is murder; for it was not given

---

[30] *Id.* at 227 (quoting 3 MIN. OF THE COMMON COUNCIL OF N.Y. 122 (July 27, 1716).

[31] *Id.* at 266 (citing LAUREL THATCHER ULRICH, THE MIDWIFE'S TALE: THE LIFE OF MARTHA BALLARD BASED ON HER DIARY, 1785–1812 (1991)).

[32] *Id.*

[33] *Id.*

to cure her of a disease, but *unlawfully* to destroy the child, within her . . . .[34]

Under New York law, abortion was illegal. A physician therefore committed murder if a woman died as a result of his attempted abortion, which was not regarded as medical care.

¶92     Colonial Massachusetts treated the unborn child as a life separate and apart from the mother.[35] Bethesda Spooner was convicted in Massachusetts in 1778 of conspiring with her lover to kill her husband.[36] She requested and received a stay of execution because she was pregnant. Spooner pleaded with the state's Executive Council to preserve the life of her innocent unborn child. The Council agreed that if Spooner were pregnant, she could not be executed. Ultimately, the Council decided Spooner was lying and ordered her executed. An autopsy revealed she was indeed pregnant with a male child.[37]

## II

¶93     The concurrence absurdly compares abortifacients to "feminine hygiene products" and characterizes abortion in the eighteenth century as "far safer than childbirth."[38] Concurrence, ¶¶40–41. According

---

[34] *Id.* at 227 (quoting JAMES PARKER, CONDUCTOR GENERALIS: OR, THE OFFICE, DUTY, AND AUTHORITY OF JUSTICES OF THE PEACE 216–17 (1764) (emphasis added)).

[35] *See id.* at 225–26.

[36] *Id*. at 225 (citing 2 AMERICAN CRIMINAL TRIALS 1, 5–8 (Peleg Chandler ed. 1844)).

[37]  *Id.* at 225–26.

[38] Even by modern medical standards, the comparison is preposterous and obscures the risks that abortifacients like Mifepristone pose to expectant mothers. *See* Jamie Bryan Hall & Ryan T. Anderson, *The Abortion Pill Harms Women: Insurance Data Reveals One in Ten Patients Experiences a Serious Adverse Event*, ETHICS AND PUB. POL'Y CTR. (April 28, 2025), https://eppc.org/wp-content/uploads/2025/04/25-04-The-Abortion-Pill-Harms-Women.pdf.

to the concurrence, "substances known to end pregnancies, were openly sold in stores and door-to-door." *Id.*, ¶40. Setting aside the prevalence of sometimes violent attacks on the women's body as a method of abortion,[39] the ingestible substances peddled to induce abortion were "nearly as painful and deadly as the worst injury techniques until well into the nineteenth century, and thus also were tantamount to suicide."[40]

¶94    In fact, "many modern poisons were discovered through the search for a safe dosage of abortifacients."[41] Parsley oil, a seemingly innocuous extract, was historically used to induce abortions when consumed in large quantities, but it could also cause paralysis of the nervous system.[42] Savin oil, popular for its ostensible efficacy in producing abortions, also resulted in the death of the mothers to whom it was administered.[43] Even the undergraduate research article cited by the concurrence admits that many abortion "home remedies . . . severely compromised the health of the mother."[44]

¶95    A final alternative, the insertion of an instrument through the cervix into the uterus to induce abortion—without antiseptics or anesthesia, and often with "profound ignorance of the female

---

[39]    DELLAPENNA, *supra* note 8, at 32–36 (citations omitted).

[40]    *Id.* at 37 (citing PAUL GEBHARD ET AL., PREGNANCY, BIRTH AND ABORTION 193–96 (1958); LINDA GORDON, WOMAN'S BODY, WOMAN'S RIGHT: A SOCIAL HISTORY OF BIRTH CONTROL IN AMERICA 36, 53 (1976)).

[41]    *Id.* at 48 (citing JEROME BATES & EDWARD ZAWADSKI, CRIMINAL ABORTION 88 (1964)).

[42]    *Id.* at 41 (citing FREDERICK TAUSSIG, ABORTION: SPONTANEOUS AND INDUCED 32, 353–54 (1936)); *see also* ROBERT TISSERAND AND RODNEY YOUNG, ESSENTIAL OIL SAFETY: A GUIDE FOR HEALTH CARE PROFESSIONALS 160 (2d ed. 2014).

[43] DELLAPENNA, *supra* note 8, at 44–45 (citations omitted).

[44]    Ryan Johnson, *A Movement for Change: Horatio Robinson Storer and Physicians' Crusade Against Abortion*, JAMES MADISON UNDERGRADUATE RSCH. J. 4, no. 1, at 15 (2017).

reproductive anatomy"—killed at least one third of the women who received such abortion "care" in the early 1800s.[45] The deaths stemmed from infection, the puncturing of vital organs, and the piercing of the uterine wall.[46] Romanticizing colonial-era abortions only dishonors the women who died from the practice.

### III

¶96 The concurrence attempts to slander opponents of abortion by depicting the "crusade" of Horatio Storer—a prominent obstetrician and nineteenth century anti-abortion advocate—as rooted in racism and sexism. Concurrence, ¶¶43–47. It characterizes Storer as the ostensible "father" of the modern pro-life movement, which it seeks to discredit by portraying Storer's motivations as steeped in misogyny and fueled by concern over "the population decline of 'native-born,' White Americans." *Id.*, ¶43. Whether the concurrence's portrayal of Storer is true or not,[47] focusing on the motives of the activists on either side of the abortion issue

---

[45] DELLAPENNA, *supra* note 8, at 51–56 (citations omitted).

[46] *Id.*

[47] Professor Joseph W. Dellapenna addresses the perception of Horatio Storer as the "*bête noir* of the modern orthodox history of abortion." *Id.* at 358. First, Dellapenna warns against exaggerating Storer's role in the pro-life movement. *Id.* at 359. Next, Dellapenna challenges the pro-abortion movement's villainous portrayal of Storer. *Id.* at 360 ("Storer's critics simply do not mention that Storer worked during most of his career for and with women in ways that cost him standing among men physicians and income from potential patients."). Dellapenna describes Storer as a pioneer in the field of gynecology and recounts the resistance he encountered working in a field that was predominated by women. *Id.* at 360–63, 366. Dellapenna acknowledges Storer's prejudicial opinions, but cautions against "judging a person from another time or place by historically contingent standards from a different time or place." *Id.* at 364–65. According to Dellapenna, "Storer's career hardly paints a picture of a man hostile to women or looking for a shortcut to personal advancement." *Id.* at 363. While Dellapenna admits many of Storer's views "did not entirely rise above the prejudices of his time," Dellapenna suggests that "[i]n the end, one simply must be wary of 'judg[ing] Moses by the standards of the Spartan Constitution.'" *Id.* at 364–65 (citation omitted).

does not help Chief Justice Karofsky's cause. The "mother" (aka "birthing person") of the pro-abortion movement, Margaret Sanger, was so driven by racism and eugenics that even Planned Parenthood of Greater New York canceled her.[48]

IV

¶97    Chief Justice Karofsky tells stories about women who recently died after ingesting abortion pills or during a miscarriage, blaming restrictive abortion laws for their tragic deaths. It isn't the law that caused the deaths of these women. Amber Thurman did not lose her life because she lived in a state that "severely restrict[ed] abortion care in a manner similar to Urmanski's interpretation of WIS. STAT. § 940.04," as the concurrence claims. Concurrence, ¶54. Thurman died because she failed to receive proper and legal medical care after taking medications to induce an abortion, which pro-abortion advocates promote as "safer than Tylenol."[49]

¶98    Georgia's abortion law "explicitly allows physicians to intervene in cases of medical emergencies or if the fetus has no detectable heartbeat (both of which applied to Thurman's case), and any assertion that she experienced a delay in care as a secondary effect of the law is mere speculation."[50] Ultimately, the cause of Thurman's death remains

---

[48] Nikita Stewart, *Planned Parenthood in N.Y. Disavows Margaret Sanger Over Eugenics*, N. Y. TIMES (July 21, 2020), https://www.nytimes.com/2020/07/21/nyregion/planned-parenthood-margaret-sanger-eugenics.html.

[49] Christina Francis, *Georgia's Abortion Law was Not Responsible for Young Mom's Death*, ATLANTA JOURNAL-CONSTITUTION (Sept. 18, 2024), https://www.ajc.com/opinion/georgias-abortion-law-was-not-responsible-for-young-moms-death/INK3UK22EFE4NEZHZFC5IRTVSQ/ (citing *How Safe is the Abortion Pill?* PLANNED PARENTHOOD, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/how-safe-is-the-abortion-pill (last visited May 1, 2025)).

[50] Christina Francis, *supra*, note 49; *see also* Jamie Joseph and Matteo Cina, *Georgia Doctors Speak Out to Challenge Misinformation on State's Abortion Law, Death of Amber Thurman*, FOX NEWS CHANNEL (Sept. 25, 2024), https://www.foxnews.com/politics/georgia-doctors-speak-out-challenge-

unknown; her medical records have not been made public. Failing to perform a medically necessary procedure generally constitutes medical malpractice. If Thurman's doctors failed to treat her out of an unfounded fear of prosecution, the type of propaganda cited and espoused by the concurrence bears some blame.

¶99 Candi Miller's death also occurred in Georgia, and pro-abortion advocates claim Miller died due to Georgia's abortion law. Their articles convey nothing more than speculation and selective "facts." Miller had lupus, diabetes, and hypertension.[51] She died at home two days after it is presumed she took an abortion pill she ordered online.[52] The autopsy report revealed the "cause of death" as "[c]ombined [d]rug (Fentanyl, Acetaminophen, Diphenhydramine) [i]ntoxication." The "manner of death" was "undetermined."[53]

¶100 Irrespective of what caused Miller's death, doctors would have been legally required to provide medical care and Miller would not have faced any criminal prosecution for inducing a "self-managed" abortion.[54] Similar to colonial times, peddlers of abortifacient pills market

---

misinformation-states-abortion-law-death-amber-thurman; Michael J. New, *Media Mislead on Tragic Death of Amber Thurman*, NAT'L REV. (Sept. 19, 2024), https://www.nationalreview.com/corner/media-mislead-on-tragic-death-of-amber-thurman/; Nicholas Tomaino, *The Truth About Amber Thurman's Death*, WALL ST. J. (Oct. 6, 2024), https://www.wsj.com/opinion/the-truth-about-amber-thurmans-death-abortion-procedure-state-laws-healthcare-f302e4f9.

[51] Kavitha Surana, *Afraid to Seek Care Amid Georgia's Abortion Ban, She Stayed at Home and Died*, PROPUBLICA (Sept. 18, 2024), https://www.propublica.org/article/candi-miller-abortion-ban-death-georgia.

[52] Carol Novielli, *Autopsy Report of Candi Miller, Who Died After Taking Abortion Pill, Raises Crucial Questions*, LIVEACTION NEWS (Sept. 23, 2024), https://www.liveaction.org/news/autopsy-report-candi-miller-abortion-pill-questions/.

[53] *Id.*

[54] *Know Your State's Abortion Laws: A Guide for Medical Professionals*, ABORTION DEF. NETWORK (last updated Jan. 2024)

them as safe despite their documented risks.[55] Unlike colonial times, effective medical care is available to women who attempt "self-managed" abortions, but fear-mongering pro-abortion propagandists convince women otherwise, with fatal and tragic consequences.

¶101 Joselli Barnica died from apparent gross medical malpractice by physicians who reportedly withheld medically necessary care while she suffered a miscarriage.[56] Even the progressive media outlet ProPublica acknowledges as much.[57] The concurrence does not, instead using Barnica's tragic death to stoke fear and spread misinformation. A statement issued by Susan B. Anthony Pro-Life America and the Charlotte Lozier Institute describes the facts and the law:

> We mourn the tragic loss of Josseli Barnica. Her death was preventable. But let's be crystal clear: Texas' law and every pro-life state law calls on doctors to act in circumstances just like Josseli's," said SBA Pro-Life America's State Policy Director Katie Daniel. No pro-life laws prevent doctors from providing emergency care for expectant moms, they must intervene to save women's lives—and in Texas, the numbers show that there are doctors who understand the law.

---

https://abortiondefensenetwork.org/wp-content/uploads/2024/01/Georgia_ADN-Know-Your-State_Feb-2024.pdf.

[55] Hall & Anderson, *supra* note 38.

[56] *As Abortion Law Misinformation Looms, Save the Storks Sets the Facts Straight*, SAVE THE STORKS (last visited Mar. 31, 2025), https://savethestorks.com/2024/10/as-abortion-law-misinformation-looms-save-the-storks-sets-the-facts-straight/.

[57] Cassandra Jaramillo & Kavitha Surana, *A Woman Died After Being Told It Would Be a "Crime" to Intervene in Her Miscarriage at a Texas Hospital*, PROPUBLICA (Oct. 30, 2024), https://www.propublica.org/article/josseli-barnica-death-miscarriage-texas-abortion-ban ("After reviewing the four-page summary, which included the timeline of care noted in hospital records, [experts] agreed that requiring Barnica to wait to deliver until after there was no detectable fetal heartbeat violated professional medical standards because it could allow time for an aggressive infection to take hold.").

> Doctors who fail to provide necessary medical care should be held accountable.
>
> Lies to women about their pregnancy care are at the root of this tragic case. The law is clear, but the media and abortion advocates have created confusion where there should be none. Texas law, like pro-life laws in every other state, allows emergency care, miscarriage care and treatment for ectopic pregnancy. Claims that abortion laws prevent emergency care are precisely the problem. States like Texas, South Dakota and Florida are taking crucial steps to mitigate misinformation by educating doctors that they must exercise their reasonable medical judgment and intervene in life-threatening situations. But politicians and the media must also do their part.[58]

The same could be said for judges, who should stick to rendering opinions on the law rather than publishing policy position papers.

\* \* \*

¶102　In her concurrence, Chief Justice Karofsky honors the lives of three women who died after attempting to abort their children and the life of another who died from medical malpractice during a miscarriage. She understandably mourns these women. America mourns with her. Legal judgments, however, must be grounded in law, not grief. Judges incapable of rendering impartial judgments based on the law must recuse. *See* WIS. STAT. § 757.19(2)(g) (2023–24) ("Any judge shall disqualify himself or herself from any civil or criminal action or proceeding when . . . a judge determines that, for any reason, he or she cannot, or it appears he or she cannot, act in an impartial manner."); SCR 60.04(4) ("[A] judge shall recuse himself or herself in a proceeding . . . when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows

---

[58] *ProPublica Doubles Down on Abortion Lies Ahead of Election, Putting Lives at Risk*, SUSAN B. ANTHONY PRO-LIFE AMERICA (Oct. 30, 2024), https://sbaprolife.org/newsroom/press-releases/propublica-doubles-down-on-abortion-lies-ahead-of-election-putting-lives-at-risk.

or reasonably should know would reasonably question the judge's ability to be impartial.").

¶103   With no apparent sense of irony, the concurrence claims abortion restrictions amount to "death warrants" for women, ignoring the people who feel just as passionately that abortion kills innocent human lives[59]—more than 1,000,000 in each of the last two years.[60] The resolution of this divisive question does not belong with the judiciary. The question of abortion belongs with the People.

¶104   "The people must know better than the court what their own morality and their own opinion is. I ask that . . . you the people, be given the chance to state your own views of justice and public morality, and not sit meekly by and have your views announced for you . . . ." ADDRESS BY THEODORE ROOSEVELT, THE RIGHT OF THE PEOPLE TO RULE, S. DOC. 62-473, at 7 (2d Sess. 1912).

¶105   When what is supposed to be the weakest branch of government[61] erases the constitutional lines demarcating the boundaries of authority the People gave each branch, the court arrogates king-like power unto itself, "laying hold of popular disquietudes" to ultimately "sweep away the liberties of the [people] like a deluge."[62] Circumventing the democratic process to more quickly conform the law to a majority's desires may be tempting, but tolerating a court's exercise of unauthorized power imperils the People's liberty. Ultimately, it is up to the people to state their views on this issue, as all others, and not sit by while four lawyers impose their own.

---

[59] "Some believe fervently that a human person comes into being at conception and that abortion ends an innocent life." *Dobbs*, 597 U.S. at 223.

[60] *Fact Sheet: Abortion in the United States*, GUTTMACHER, (April 2025), https://www.guttmacher.org/fact-sheet/induced-abortion-united-states.

[61] THE FEDERALIST NO. 78 (Alexander Hamilton).

[62] THOMAS PAINE, *supra* note 6, at 38.

BRIAN K. HAGEDORN, J., with whom REBECCA GRASSL BRADLEY, J., joins, dissenting.

¶106   The Wisconsin Constitution vests the lawmaking power of the people in the state legislature. But today, the Wisconsin Supreme Court effectively deletes a law from the books, taking this power unto itself. Sure, the majority opinion is laden with legal jargon a reader might think reflects a reasoned judicial opinion. Don't be fooled. This is pure policymaking, driven by antagonism toward a law the majority does not like. The end result is that the policies enacted by the people's representatives are gone—scratched out with a giant judicial eraser.

¶107   This decision does not derive from a neutral application of the law; it does not even pass the smell test. But it is more than that. If the people's policy choices will be constantly second-guessed by this court, our very system of self-government is in danger. The abortion policies the court wipes away today were passed by the legislature and signed by the governor. These policy questions will continue to divide Wisconsinites. But the question of who decides what the law should be ought not divide us. Today, the court aggrandizes power to itself, rewrites the law in its own image, and undermines our constitutional order. I dissent.

## I.  WHAT THIS CASE IS ABOUT

¶108   Although the details have changed, Wisconsin has banned abortions in some capacity since its founding. The majority highlights that the first version of the statute at issue here dates to 1849, and three times calls it the "19th century near-total ban on abortion." This odd emphasis on age is a not-so-subtle insinuation that the law has less legitimacy because its roots extend deep into the past. There is, of course, no legal or logical basis to suggest that a law of long standing is less of a law.[1] That argument may have political appeal, but it is a foolish bit of shade to throw at a law in a judicial opinion.[2] And with regard to the statute before

---

[1] No one suggests, for example, that the First Amendment right to freedom of speech has less legal force because it was adopted in 1791.

[2] The multiple references to the age of the law—including in the introduction and closing to the majority opinion—echo popular political attacks and campaign catchphrases ("the 1849 abortion law"). It would be rare for a court to repeatedly cite the age of a law—especially one that has been readopted

us today, it has been readopted, moved, and amended throughout Wisconsin history, most recently in 2011. Therefore, lest the reader be confused, the statute we review today is a duly enacted law. It is no more and no less of a law simply because portions of it are old. Its genesis has—or at least it should have—nothing to do with the legal question before us.

¶109 This case is also not about the wisdom of the state's longstanding criminal prohibition on abortion. The courts of this state have been given no authority to decide such policy questions. The constitution recognizes that it is the people, through their representatives in the state legislature, who have the power to decide what laws should govern them.[3] If this statute no longer reflects the policy preferences of the people of Wisconsin, the remedy is for the people's elected representatives to amend the law. But four justices cannot make that decision for them.

¶110  The actual legal question at the heart of this case is whether WIS. STAT. § 940.04(1) is still an enforceable abortion law. Because the statute clearly prohibits abortion, and because the legislature has not repealed the provision either explicitly or impliedly through subsequent legislation, the answer is an easy and emphatic yes.

¶111  WISCONSIN STAT. § 940.04 appears in the criminal code in a subchapter defining crimes against "life." Section 940.04 is entitled "Abortion." The primary section challenged today is 940.04(1), which provides, "Any person, other than the mother, who intentionally destroys the life of an unborn child is guilty of a Class H felony." And an "unborn child" is defined as "a human being from the time of conception until it is born alive." § 940.04(6). The statute also exempts "a therapeutic abortion" from this proscription when it is performed by a physician, is necessary "to save the life of the mother," and, unless an emergency prevents it, "is performed in a licensed maternity hospital." § 940.04(5).

---

and amended so many times. The conclusion is inescapable that the majority's rhetoric is aimed at making a political point, not a legal one.

[3] *See Gabler v. Crime Victims Rts. Bd.*, 2017 WI 67, ¶60, 376 Wis. 2d 147, 897 N.W.2d 384 ("The people bestowed much power on the legislature, comprised of their representatives whom the people elect to make the laws.").

¶112   To state the obvious, this statute serves as a criminal ban on most abortions. WISCONSIN STAT. § 940.04 has been used to prosecute those performing abortions,[4] its title and text say it is about "abortion," and the intentional destruction of "the life of an unborn child" is exactly what happens in an abortion. But the obvious needs to be stated because the circuit court ruled that § 940.04(1) is not about abortion, but feticide, relying on language from a prior case dealing with a prosecution for feticide under § 940.04(2). The petitioners here make the same argument. As a matter of statutory interpretation, that conclusion misses the mark by a long shot. The majority recognizes this. It holds that newer abortion laws impliedly repealed § 940.04(1) precisely because they cover the field of abortion policy. Necessarily then, the majority agrees § 940.04(1) covers abortion. Therefore, the circuit court's holding was incorrect, and the petitioners' arguments that § 940.04(1) is not about abortion are unanimously rejected by this court.

¶113   The question, then, is whether WIS. STAT. § 940.04's abortion prohibitions—which were rendered unenforceable by *Roe v. Wade* from 1973–2022—are again enforceable. Our starting point is the fact that the legislature has never explicitly repealed the statute. When you open the statute books containing the laws of the state of Wisconsin, § 940.04 is still there. And when a statute is declared unconstitutional, but a subsequent decision overturns that declaration of unconstitutionality, "the operative force of the act is restored by the overruling decision without any necessity for reenactment." 1 NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 2:7 (7th ed. 2024). This means our foundational assumption is that § 940.04 is still the law and is enforceable. The majority does not disagree, but holds that the legislature functionally repealed the statute through its enactment of new laws concerning abortion.

---

[4] *See State v. Cohen*, 31 Wis. 2d 97, 142 N.W.2d 161 (1966); *State v. Mac Gresens*, 40 Wis. 2d 179, 161 N.W.2d 245 (1968); *State v. Harling*, 44 Wis. 2d 266, 170 N.W.2d 720 (1969).

## II.  WAS Wis. Stat. § 940.04(1) IMPLIEDLY REPEALED?

### A.  IMPLIED REPEAL GENERALLY

¶114   The petitioners invoke the rarely used, highly disfavored doctrine of implied repeal. The majority concludes WIS. STAT. § 940.04 is no longer an enforceable law because the legislature repealed it through later enactments. It says that the legislature intended to create a "substitute" for the "near-total ban on abortion" in § 940.04(1) by "enacting comprehensive legislation about virtually every aspect of abortion including where, when, and how health-care providers may lawfully perform abortions." This analysis carries a veneer of law and logic. But even the most cursory glance into the doctrine of implied repeal reveals the majority's rationale for what it is: an almost-clever way for the majority to get rid of a law it disfavors.

¶115   At its core, implied repeal is a question of statutory interpretation. Our role in reading statutes is to determine—neutrally, reasonably, and in context—what the legislature meant by the words it enacted.[5]

¶116   The general rule is when the legislature enacts a statute, it remains the law unless and until the legislature enacts a new statute repealing it. In exceedingly rare circumstances, however, courts have determined that a law that remains on the books has been impliedly repealed by a later legislative enactment. But anyone asserting this must overcome a strong legal presumption against this finding. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 327 (2012). Courts are not just reticent to find implied repeal, they almost never do so. *See Branch v. Smith*, 538 U.S. 254, 293 (2003) (O'Connor, J., concurring in part, dissenting in part) ("We have not found

---

[5] *See State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110 ("[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect."); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 29 (2012) ("In the interpretation of legislation, we aspire to be 'a nation of laws, not of men.' This means (1) giving effect to the text that lawmakers have adopted and that the people are entitled to rely on, and (2) giving *no* effect to the lawmakers' unenacted desires.").

*any* implied repeal of a statute since 1975 . . . And outside the antitrust context, we appear not to have found an implied repeal of a statute since 1917."). As one scholar observed, the presumption against implied repeal is so strong that it "seems to have evolved into a virtual rule against implied repeals." Karen Petroski, *Retheorizing the Presumption Against Implied Repeals*, 92 CALIF. L. REV. 487, 511 (2004). The strength of this presumption springs from two sources.

¶117 First, courts presume that when the legislature creates new laws, it knows what's already there on any particular topic and intends to create a "consistent body of law." 1A SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 23:9 (8th ed. 2025); *see also* 2B NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND'S STATUTES AND STATUTORY CONSTRUCTION, § 51:2 (7th ed. 2012); *Mack v. Joint Sch. Dist. No.3*, 92 Wis. 2d 476, 489, 285 N.W.2d 604 (1979). Without the foundational presumption that the legislature is attempting to create a coherent and complementary body of law, it would be impossible to determine what the effect of any law is. *United States v. Hansen*, 772 F.2d 940, 944 (D.C. Cir. 1985). Implied repeal, on the other hand, is a conclusion that the legislature wasn't consistent and didn't realize the effect of its later enactment. *Id.* at 944–45. Given the gravity of this conclusion, we better be sure if we're going to decide that the legislature repealed a law implicitly when it did not do so the normal way—through explicit repeal. *Id.* at 945.

¶118 In addition, the reticence to declare a law impliedly repealed is rooted in our duty to stay in our constitutional lane. The constitution vests the legislature with the authority to write statutes and to remove them. *See* WIS. CONST. ART. IV, § 1. So when we determine that a statute the legislature has not expressly repealed has been impliedly repealed, we must be thoroughly convinced that voiding the democratically enacted law is what the legislature intended through its actions. *See State v. Foley*, 443 A.2d 452, 453 (Vt. 1982). In this way, the strong presumption against implied repeal is "grounded in judicial respect for the ultimate authority of the legislature over lawmaking." *Id.*

¶119 Yet, on rare occasions, courts have concluded that a statute has been impliedly repealed. The cases fall into two categories. One is when the legislature enacts a law that creates an "irreconcilable conflict" with an older law on the same subject, such that a person could not possibly comply with both. *See State ex rel. City of Milwaukee v. Milwaukee Elec. Ry. & Light Co.*, 144 Wis. 386, 394, 129 N.W. 623 (1911); *Fleming v. Barry*, 21 Wis. 2d 259, 267, 124 N.W.2d 93 (1963); *Jicha v. Karns*, 39

Wis. 2d 676, 680, 159 N.W.2d 691 (1968). The second category is when the legislature enacts a "later and more general act [that] governs the whole subject to which it relates, and is manifestly designed to embrace the entire law" on a particular subject. *Gymnastic Ass'n of the South Side of Milwaukee v. City of Milwaukee*, 129 Wis. 429, 432, 109 N.W. 109 (1906); *see also State v. Campbell*, 44 Wis. 529, 535 (1878).

¶120  When faced with an implied repeal argument, our starting point is to construe the statutes together, giving all provisions under consideration their full effect. If there is any way the statutes can be given "a construction which will give an operation to both," we must do so. *Att'y Gen. ex rel. Taylor v. Brown*, 1 Wis. 442 [513*], 451–52 [525*] (1853). Only in the face of incontrovertible evidence from the plain meaning of the statutory text that the legislature must have meant to repeal an earlier statute will we conclude an earlier statute is impliedly repealed. *See State ex rel. Hayden v. Arnold*, 151 Wis. 19, 29, 138 N.W. 78 (1912); *City of Madison v. S. Wis. Ry. Co.*, 156 Wis. 352, 360, 146 N.W. 492 (1914). And even then, we will only find the earlier statute impliedly repealed to the extent the earlier statute and later statute are irreconcilable, or the later statute necessarily restricts or modifies the earlier statute because of the later statute's express terms. *McLoughlin v. Malnar*, 237 Wis. 492, 497, 297 N.W. 370 (1941). In this way, we respect the legislature's role in the constitutional order by presuming it has diligently carried out its own role.

¶121  The majority concludes the legislature repealed WIS. STAT. § 940.04 under the second of the two categories of implied repeal: implied repeal by substitution.

### B.  IMPLIED REPEAL BY SUBSTITUTION

¶122  For a court to find that the legislature impliedly repealed a statute through a later substitute, a litigant must demonstrate that the legislature designed a newer law to act as a substitute for all previous laws on the topic. 82 C.J.S. *Statutes* § 330 (2025). Quoting a leading treatise, we explained in *State v. Campbell* that a statute is impliedly repealed when a "subsequent statute" revises "the whole subject matter of a former one," and is "evidently intended as a substitute for it." 44 Wis. at 535. We can therefore break it down into three prerequisites: 1) a singular act; 2) covering the whole field; 3) that was clearly intended to be the sole governing law on the topic.

*1. A Singular Act*

¶123 First, our cases on implied repeal suggest that, when working under the later comprehensive act theory, the substitute must be just that—an act reflecting a new statutory scheme. This is because under that theory of implied repeal, the later act must by necessary implication subsume *everything* that came before, not just cause an apparent conflict here or there. No Wisconsin authorities cited by the parties support the notion that a series of discrete and narrower statutes enacted over time comprise a "substitute" act or "cover the field"—nor has my research uncovered any.

¶124 Although all of our cases bear this out, our discussion in *Wisth*—a case relied on by the majority—is particularly helpful.[6] There we said that a substitutionary act is one in which the "intent to repeal all former laws upon the subject is made apparent by the enactment of subsequent comprehensive legislation establishing elaborate inclusions and exclusions of the persons, things, and relationships ordinarily associated with the subject." *Wisth v. Mitchell*, 52 Wis. 2d 584, 589, 190 N.W.2d 879 (1971).

---

[6] *See, e.g., Gymnastic Ass'n of the South Side of Milwaukee v. City of Milwaukee*, 129 Wis. 429, 431, 109 N.W. 109 (1906) (determining whether the plaintiff's tax liability was governed by the special act incorporating it, or the general *statute* enacted later); *State ex rel. City of Milwaukee v. Milwaukee Elec. Ry. & Light Co.*, 144 Wis. 386, 394, 129 N.W. 623 (1911) (determining whether a rule of a public charter was repealed by a specific *ordinance*); *City of Madison v. S. Wis. Ry. Co.*, 156 Wis. 352, 362–63, 146 N.W. 492 (1914) (determining whether a later *ordinance* repealed an earlier one); *Chippewa & Flambeau Improvement Co. v. R.R. Comm'n Of Wis.*, 164 Wis. 105, 118, 159 N.W. 739 (1916) (determining whether a particular *act* repealed an earlier statute); *see also* 82 C.J.S. *Statutes* § 330 (2025) ("If a later *act* covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate as a repeal of the earlier act. In order to effect a repeal by implication on this ground, it must appear that the subsequent *statute* covered the whole subject matter of the former one and that it was intended as a substitute for it." (emphasis added)); 1A SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 23:9 (8th ed. 2025) ("[A] repeal may arise by necessary implication from the enactment of a subsequent *act*."(emphasis added)).

¶125 We pulled this definition from a well-respected treatise, which explained:

> Statutes in pari materia, and relating to the same subjects, are to be taken and construed together because it is to be inferred that they had one object in view and were intended to be considered as constituting one entire and harmonious system. But when the new statute, *in itself*, comprehends the entire subject, and creates a new, entire, and independent system, respecting that subject matter, it is universally held to repeal and supersede all previous systems and laws respecting the same subject matter.

1 FRANK E. HORACK JR., SUTHERLAND'S STATUTES AND STATUTORY CONSTRUCTION § 2018 (3d ed. 1943) (emphasis added) (citation omitted). In other words, where multiple enactments addressing the same subject are spread across the statute books, we read them together as comprising the governing law on the matter. Legislatures, after all, often pass cumulative or explanatory statutes to build upon earlier ones or make them more effective. *Milwaukee Elec. Ry. & Light Co.*, 144 Wis. at 394; *see* 82 C.J.S. *Statutes* § 330 (2025). It is not enough for any one statute to simply embrace the same topic as another. *See Milwaukee Elec. Ry. & Light Co.*, 144 Wis. at 395. Implied repeal by substitution is found only when the legislature passes an act that covers everything, subsuming all that came before.[7] *Wisth*, 52 Wis. 2d at 589.

¶126 The majority, however, does not point to a singular act. Instead, it relies on a host of disparate and often overlapping abortion-related statutes passed over the course of decades. Moreover, the majority

---

[7] It is perhaps possible two different enactments might work together to create a single comprehensive statutory scheme replacing everything that came before, but our cases do not reflect this. We must keep in mind the main principle that distinguishes the cover-the-field theory of implied repeal from the irreconcilable conflict theory of implied repeal. A comprehensive act should be a comprehensive act, not a smattering of enactments over the years generally touching a subject area, as we have here. Newer piecemeal acts may create specific conflicts with earlier laws. But those should be resolved under different rules of statutory construction, not implied repeal by comprehensive legislation—the theory relied on by the majority here.

does not say when over those 40 years the legislature once and for all repealed WIS. STAT. § 940.04(1). Was it when the legislature passed a post-viability ban? A partial-birth abortion ban? A twenty-week ban? A waiting period? A physician licensing requirement? The majority fails to say. As discussed below, the legislature amended § 940.04 in 2011. Does the majority believe the legislature modified a repealed law? The legislature even referenced § 940.04 as a valid abortion law in another statute in 2015. *See* 2015 Wis. Act 64, § 4. Was it after that? The majority doesn't have any answer or response, because there is none.

¶127    The majority does not offer any Wisconsin authorities that justify its unprecedented approach. The one case it does cite concerns an antitrust doctrine that "addresses situations in which there is no explicit statutory exception to antitrust law but it is reasonably clear that the legislature intended to allow municipalities to undertake an action that is anticompetititve." *Eichenseer v. Madison-Dane Cnty. Tavern League, Inc.*, 2008 WI 38, ¶39, 308 Wis. 2d 684, 748 N.W.2d 154. The type of antitrust immunity doctrine discussed in *Eichenseer* cites to no Wisconsin implied repeal cases, involves a test used in no implied repeal cases, and has never been relied upon for an implied repeal case as that doctrine has been used and understood since before the state's founding. It is simply an altogether different doctrine than the implied repeal doctrine the majority invokes.

¶128    The majority, then, cannot identify a single Wisconsin authority employing the covering-the-field theory of implied repeal in a way that supports its novel approach here.[8] It holds that a whole series of

---

[8] The majority also cites several non-Wisconsin authorities. As an initial matter, Wisconsin's approach to implied repeal is a matter of Wisconsin law, not that of other jurisdictions. And with respect to the cases cited, only three are appellate decisions. One is a California case from 1897 that found an older law was impliedly repealed by two later acts that both contained the same relevant provisions as one another; the court even referred to the two later provisions as the "new act." *Dillon v. Bicknell*, 47 P. 937, 937 (1897). This case does not provide support for the majority's approach of relying on a host of discrete statutes that touch the topic of abortion. The other two cases the majority cites are not from a state supreme court, and with all due respect to my judicial colleagues on other courts, contain little in the way of legal analysis. *See McCorvey v. Hill*, 385 F.3d 846 (5th Cir. 2004); *In re Leon Guerrero*, 2023 Guam 11 (2023). They offer short, cursory conclusions, and are unclear about which category of implied

discrete laws over decades were meant by the legislature to be the sole governing law on a topic and repealed just one of the statutes that came before. The majority may style itself as just applying established law, but it is doing nothing of the sort; its newly invented cover-the-field rule has no precedent in the Wisconsin reports.

### *2. Covering the Field*

¶129   Second, and relatedly, the act must show that the legislature intended it to "cover the whole subject" through its comprehensiveness. This can be shown in two different ways.

¶130   The first is when it revises and codifies all existing laws on a subject. *Milwaukee Elec. Ry. & Light Co.*, 144 Wis. at 395; *see also Campbell*, 44 Wis. at 535. For example, a recodification law may include language that earlier laws conflicting with it are "hereby repealed," which this court has found to mean the law was a substitute for all that came before, whether actually conflicting or not. *See Campbell*, 44 Wis. at 534–35; *City of Madison*, 156 Wis. at 362 (saying this language was "the ordinary way of closing a new enactment . . . designed to take the place of all prior laws on the subject"). In one case, for instance, when an ordinance applying to railroad maintenance included this repealing language, we found that it was the legislature's "intention . . . to make a complete charter" on the topic. *City of Madison*, 156 Wis. at 364. As such, it repealed an earlier, non-conflicting ordinance on the topic. *See id.* at 362–63. Or, more obviously, when an act explicitly says it is an "act to revise and codify" certain statutes, it will be found to repeal earlier laws on the same subject. *State ex rel. Thompson v. Beloit City Sch. Dist.*, 215 Wis. 409, 412, 414, 253 N.W. 598 (1934).

¶131   The second way is when the new act "is so broad in its terms and so clear and explicit in its words," that repeal of what came before is the obvious and necessary conclusion. *Ward v. Smith*, 166 Wis. 342, 344, 165 N.W. 299 (1917). This occurs when the scope of the second act is so large concerning a particular subject that it "swallows up" earlier, discrete acts on a subset of that subject. *See id*. For example, this court has found a

---

repeal they are attempting to apply. The fact that this is all the support the majority can muster speaks for itself.

law governing one gym to be impliedly repealed when the legislature passed a law governing all gyms. *Gymnastic Ass'n of the South Side of Milwaukee*, 129 Wis. at 432-33. Likewise, we found a statute pertaining to one dam was impliedly repealed by a law governing all dams in the state. *Chippewa & Flambeau Improvement Co. v. R.R. Comm'n of Wis.*, 164 Wis. 105, 118, 159 N.W. 739 (1916).

¶132 As before, the majority does not even try to tailor its analysis to the proper legal test, and its logic fits neither of these categories. The majority points to no statutory language suggesting a revision and codification meant to cover WIS. STAT. § 940.04, so the first kind of covering-the-field substitute does not apply. And the majority gets nowhere close to the second option either. The majority insists that § 940.04 would "swallow up" or otherwise render meaningless certain statutes coming after it, and therefore, those later statutes were meant as a substitute. In other words, the majority reasons that a host of narrower statutes applying to *some* abortions impliedly repealed a broader statute applying to *all* abortions. That is exactly the opposite of how this works. A smattering of specific and narrow acts over time could not impliedly repeal a far more comprehensive law. The law the majority says is impliedly repealed applies to more categories of abortion than any subsequent enactment, not fewer.

¶133 Rather than follow existing cover-the-field law, the majority instead asks if the new collection of laws answer the "who, what, where, when, and how" of abortion. The majority provides no legal support for why this is the appropriate standalone question. After all, newer laws can answer lots of questions, but that doesn't mean they repeal any older law on the same topic. In any event, the enacted statutes do not do what the majority says. The majority points to WIS. STAT. § 940.15, which bans post-viability abortions, and WIS. STAT. § 253.107, which bans abortions at or after 20 weeks, and says that these statutes mean abortions are lawful if they are pre-viability or before 20 weeks. But that is not true. These are criminal laws, which only say when an action is illegal, not when an action is legal. *See United States v. Batchelder*, 442 U.S. 114, 118–19, 122 (1979). They do not, therefore, stand for the proposition that abortions before viability or 20 weeks are lawful. The majority wrongly asserts that

the newer criminal statutes say when abortions *can* be performed; they do not. They only say when abortions *cannot* be performed.[9]

¶134   The majority also makes a kind of surplusage argument. It contends that if WIS. STAT. § 940.04 were enforceable, the other statutes would "be swallowed whole" and without a "purpose." But under well-established law, overlapping criminal prohibitions do not raise a problem at all. *See id.* at 123–24 ("This Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute[] under either so long as it does not discriminate against any class of defendants."); *State v. Cissell*, 127 Wis. 2d 205, 215, 378 N.W.2d 691 (1985). We have said that when conduct "can be prosecuted under more than one statute," the "prosecuting attorney [has] the power to choose the statute under which to proceed." *State v. Karpinski*, 92 Wis. 2d 599, 611, 285 N.W.2d 729 (1979). There is therefore no legal problem with multiple statutes criminalizing the same behavior, and doing so differently.[10] Similarly, even if a doctor performs an abortion at 15 weeks and is not

---

[9] It is also unclear how the majority thinks the later two criminal laws work cohesively. One would think that, under the majority's logic, one or the other would also be impliedly repealed. One statute criminalizes abortions after viability, another after a child can feel pain. WIS. STAT. §§ 940.15(2), 253.107(3)(a). Viability is defined as the "stage of fetal development when, in the medical judgment of the attending physician based on the particular facts of the case before him or her, there is a reasonable likelihood of sustained survival of the fetus outside of the womb, with or without artificial support." § 940.15(1). This standard is a moving target, but is typically considered around 23–24 weeks. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 276 (2022) (where the respondents in that case drew the line). "[A]n unborn child is considered to be capable of experiencing pain" at and after a postfertilization age of 20 weeks. § 253.107(3)(a). This would mean according to the majority's logic that the 20-week abortion ban would render the post-viability ban "meaningless" and thus, repealed.

[10] The majority makes similar arguments regarding the various regulatory abortion provisions. Many would still serve a purpose, however. And while some regulations do sit in tension with a general ban on abortion, that gets nowhere close to a manifest showing that the legislature intended to do away with WIS. STAT. § 940.04 altogether. Rather, as explained below, the legislature crafted these regulations while § 940.04 was unenforceable under *Roe*.

subject to criminal liability under the 20-week abortion ban, there is no reason why the physician performing the abortion could not be charged under § 940.04. *See State v. Grandberry*, 2018 WI 29, ¶21, 380 Wis. 2d 541, 910 N.W.2d 214. We can acknowledge the incongruity between some of the laws, but we cannot reasonably conclude that the legislature meant to eliminate the broader law when it passed the narrower ones.

¶135 In short, the majority does not present a logical case for why discrete and narrower laws that prescribe some rules regarding when abortion is illegal and how it must be performed can serve as a complete and total substitute for all abortion laws in the statutes—including a broader statute that applies to nearly all abortions. Once again, the majority makes no effort to apply established law in this area, blazing new legal ground in service of its outcome-focused approach.

### 3. *Clear Legislative Intent*

¶136 Thus far, we have seen that implied repeal of the kind adopted by the majority requires a singular act covering the entire subject area of abortion. The final inquiry is an honest assessment of whether the legislature clearly meant to repeal the law.[11] Implied repeal is a dramatic

---

[11] We have also long understood the question of implied repeal to be one of legislative intent. *See, e.g.*, *Foster v. Hammond*, 37 Wis. 185, 188 (1875) (finding two statutes could "stand together" since that "was the manifest intention of the legislature"); *Gilkey v. Cook*, 60 Wis. 133, 139, 18 N.W. 639 (1884) ("We are not unmindful of the rule of construction which has frequently been recognized by this court that where the later statute covers the whole subject of the earlier, and embraces new provisions which plainly show that it was intended as a substitute for the first, it will operate as a repeal by implication. But it is a question of legislative intent, which, in the case before us, is plain, as we have stated."); *City of Madison*, 156 Wis. at 360 (stating that the rules of statutory interpretation concerning implied repeal "are subject to the ultimate purpose of giving effect to the legislative intent, when from the whole body of an act, or by a comparison of an enactment with others, or other circumstances characterizing the new enactment, it is clear that a repeal was not intended and the real purpose can be carried out by aid of judicial construction"); *State ex rel. Hayden v. Arnold*, 151 Wis. 19, 29, 138 N.W. 78 (1912) ("[T]he purpose of construction is to give effect to the legislative intent so far as that can reasonably be read out of the language used to express it."); *McLoughlin v. Malnar*, 237 Wis. 492, 496, 297 N.W. 370 (1941)

holding that the legislature's later actions repealed a statute because it effectively missed the import of how its new enactment would impact other statutes. *See Hansen*, 772 F.2d at 944–45. The petitioners therefore face an extraordinarily high burden to overcome the presumption against holding that the legislature functionally repealed a law that it has not expressly repealed. *See id.* at 945; 82 C.J.S. *Statutes* § 328 (2025) ("[A] repeal by implication requires clear and compelling evidence of legislative intent, and such intent must be free from reasonable doubt."). Courts require a showing that the legislature "evidently," "obviously," "unambiguously," or "manifestly" intended that the later statute be a substitute for the earlier one. 82 C.J.S. *Statutes* §§ 330, 331 (2025); *Beloit City Sch. Dist.*, 215 Wis. at 416; *Milwaukee Elec. Ry. & Light Co.*, 144 Wis. at 395; *Ward*, 166 Wis. at 344.

¶137 To determine what the legislature intended, we look to the plain meaning of the statutory text. *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. This includes looking at the statute's structure and historical context. *See id.*, ¶46; *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶20, 400 Wis. 2d 417, 970 N.W.2d 1. Since we presume that the legislature is knowledgeable about existing laws, statutes "must be interpreted in light of . . . the scheme of jurisprudence existing at the time of its enactment." *Strenke v. Hogner*, 2005 WI 25, ¶28, 279 Wis. 2d 52, 694 N.W.2d 296; *see also Mack*, 92 Wis. 2d at 489. When asking whether a statute has been impliedly repealed, we try to make sense of the legislature's enactments. For example, if the allegedly repealed statute was "an obscure and little-noticed provision whose existence the legislature may have overlooked," that might explain why it was not explicitly repealed. *State v. Dairyland Power Coop.*, 52 Wis. 2d 45, 52, 187 N.W.2d 878 (1971).

¶138 We also consider whether the legislature ever acknowledges or takes actions regarding the alleged statute after its supposed repeal, which would strongly suggest the legislature meant for the law to remain enforceable. Of particular import here, we have said that when the legislature amends a statute and does not explicitly repeal it, a "finding of a repeal by implication [is] simply impossible." *Id*.

("While repeals by implication are recognized, they do not result except when the intent of the legislature clearly appears.").

¶139   When we interpret the relevant legislative enactments, it is glaringly obvious that the legislature did not intend to repeal WIS. STAT. § 940.04. Instead, the abortion statutes in Wisconsin developed against the backdrop and in response to *Roe v. Wade*, which rendered § 940.04 unenforceable. Reading the majority, you'd be forgiven if you blinked and missed the fact that the story of abortion law in Wisconsin between 1973 and 2022 completely depends on and flows from *Roe v. Wade* and its progeny. Even though this story is missing from the majority, notwithstanding *Roe*, the legislature preserved § 940.04 and even amended it despite its unenforceability.

¶140   In *Roe v. Wade*, the United States Supreme Court considered the constitutionality of a Texas law that prohibited abortion. 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). The Court created a trimester framework for balancing a mother's rights against the state's interest in unborn life.[12] *Id.* at 162–65. The Court determined that the most critical line for balancing these interests was viability, by which it meant whether the unborn child could survive outside the womb. *Id.* at 160. It pegged that line at about seven months, after the second trimester. *Id.* at 160, 164. Thus, the Court held that before viability, abortion could only be regulated in ways "reasonably related to maternal health" to comport with due process. *Id.* at 164. As a consequence, the Court concluded that state statutes restricting legal abortions except to save the life of the mother swept too broadly. *Id*. The Court directly cited WIS. STAT. § 940.04 as similar to the Texas statute it deemed unconstitutional, and the Eastern District of Wisconsin confirmed a year later that *Roe* rendered the statute unenforceable. *Id.* at 118 n.2; *Larkin v. McCann*, 368 F. Supp. 1352, 1354 (E.D. Wis. 1974). This meant that Wisconsin could no longer enforce § 940.04, but not that it was off the books.[13]

---

[12] Under the trimester framework, the Court divided pregnancy into three categories, with varying levels of state interest. In the first trimester, the state was not allowed to interfere with a woman's decision, assisted by her physician, to obtain an abortion. *Roe v. Wade*, 410 U.S. 113, 164 (1973). In the second trimester, regulations were permissible to the extent they were reasonably related to maternal health. *Id*. In the third trimester, the state could regulate or prohibit abortion, except when necessary for the life or health of the mother. *Id.* at 164–65.

[13] Courts can enjoin the enforcement of unconstitutional laws, but they cannot and do not delete them. *See* 1A SHAMBIE SINGER, SUTHERLAND STATUTES

¶141 *Roe* also established boundaries around when and how states could restrict or regulate abortion. The Court said that states could pass regulations such as who could perform abortions, where they could do so, and what licensing requirements abortion providers would need to obtain. *Roe*, 410 U.S. at 163. The Court in *Roe* also told states the extent to which they could still criminalize or restrict abortions. It said that if a state was "interested in protecting fetal life after viability, it may go so far as to proscribe abortion during that period, except when it is necessary to preserve the life or health of the mother." *Id.* at 163–64.

¶142 With Wis. Stat. § 940.04 no longer enforceable, the Wisconsin legislature passed a new criminal abortion ban in 1985. It made it a crime for anyone to "perform[] an abortion after the fetus or unborn child reaches viability" except when it is "necessary to preserve the life or health of the woman." Wis. Stat. § 940.15(2), (3). It is not guesswork why the crime was defined this way. It mirrored precisely both *Roe*'s focus on the viability of the unborn child and its exception for the life or health of the mother.

¶143 If this copy-and-pasted-language were not obvious enough, the legislative history confirms this is what the legislature intended. A memo drafted by Legislative Council staff a year after Wis. Stat. § 940.15's passage removes all doubt. The memo said that the new legislation "*retained the present criminal abortion law* that was created prior to the 1973 Supreme Court decision in *Roe v. Wade*," and also "created a *new criminal abortion law* stating that whoever intentionally performs an abortion after the fetus or unborn child reaches viability . . . is guilty of a Class E felony." Information Memorandum 86-16, "Pregnancy-Related Legislation Enacted by the 1985-86 Wisconsin Legislature," Wisconsin Legislative Council Staff, 9 (July 1, 1986). This was to comply with "the framework of the U.S. Constitution" post-*Roe*. *Id.* at 1. Not only that, but the drafting file for § 940.15 shows that the legislature contemplated whether to explicitly repeal Wis. Stat. § 940.04, but ultimately did not. *See* Drafting File, 1985 Wis. Act 56, Legislative Reference Bureau, Madison, Wis. Although the

AND STATUTORY CONSTRUCTION § 23:20 (8th ed. 2025) ("State statutes that are unconstitutional . . . merely are unenforceable or suspended."); Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute.").

majority shrugs this off, this legislative history confirms what the statutory text reveals: not only was the legislature acutely aware of § 940.04 when it passed this new law criminalizing abortion, it deliberately intended for it to stay on the books. And, even more, the legislature did not intend § 940.15 to cover the field of abortion in Wisconsin.

¶144 The legislature's post-*Roe* regulatory statutes likewise were not intended as a comprehensive scheme to implicitly repeal WIS. STAT. § 940.04, as evidenced by the U.S. Supreme Court's decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (plurality op.). In 1992, the United States Supreme Court reaffirmed what it framed as one of *Roe*'s core holdings that a woman has the right to choose to have an abortion before fetal viability and that the state could "restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health." *Id.* at 846. Despite that reaffirmation, it rejected *Roe*'s trimester framework and its "rigid prohibition on all previability regulation aimed at the protection of fetal life." *Id.* at 873. The *Casey* court noted that *Roe* recognized the state's interest in protecting life, and thus, only those regulations that were unduly burdensome such that they had "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" were unconstitutional. *Id.* at 875–77. In *Casey*, the Court upheld the constitutionality of regulations requiring doctors to inform patients of fetal development and potential assistance options if they proceeded with the pregnancy, to obtain informed or parental consent, and to wait 24 hours before the abortion. *Id.* at 881–82, 886, 899.

¶145 It is no surprise, then, that the Wisconsin Legislature followed the parameters outlined by the U.S. Supreme Court. It enacted a host of regulatory laws around abortion to fit within what the Court said was permissible.[14] These laws do not somehow prove a legislative effort to

---

[14] Many of these regulations are similar to those deemed permissible in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) (plurality op.). For example, to obtain informed consent from a mother seeking an abortion, a physician must inform the mother 24 hours in advance of the probable gestational age of the unborn child, the probable anatomical and physiological characteristics of the child, benefits available for parental care and

repeal WIS. STAT. § 940.04 through a comprehensive scheme. Quite the opposite. They reflect a piecemeal approach that recognized the limitations imposed by the Supreme Court.

¶146 If all this were not enough, this court affirmed in 1994 that the reason for the post-viability ban in WIS. STAT. § 940.15 was because WIS. STAT. § 940.04 was rendered unenforceable by *Roe*. *State v. Black*, 188 Wis. 2d 639, 646, 526 N.W.2d 132 (1994). *Black* involved a man who caused the death of an unborn child by punching a pregnant woman in the abdomen. *Id.* at 641. The state charged the man under § 940.04(2), which made it a crime to "[i]ntentionally destroy[] the life of an unborn quick child." *Id.* The defendant argued before us that the statute did not apply to him because it was a statute criminalizing consensual abortions, not feticide. *See id.* at 643. We noted that § 940.15 "place[d] restrictions (consistent with *Roe v. Wade*) on consensual abortions," and addressed whether the legislature impliedly repealed § 940.04(2). *Id.* at 646. We concluded it did not. *Id.* at 645. We further held that the defendant could be charged for feticide under § 940.04(2).[15] *Id.* at 647. As noted above, we also opined that § 940.04(2) was not about abortion (a remarkable and unsupportable statement given the text of § 940.04 says it's about abortion). *Id.* at 645.

¶147 In response to this decision, the legislature reinforced its intention to keep WIS. STAT. § 940.04 on the books. It first enacted a host of laws criminalizing feticide, presumably so that the state would no longer have to rely upon § 940.04(2) to charge such behavior. *See* 1997

childbirth, and options for placing the child in foster care or up for adoption. WIS. STAT. § 253.10(3)(c)1.b., 1.d., 2.a, 2.c. And unless an exception applies, a physician must obtain parental consent before performing an abortion on a minor. WIS. STAT. § 48.375(4).

[15] Even though the opinion focused on the validity of a different subsection of the statute than the principal provision being called into question here, there is no reason WIS. STAT. § 940.15 would have impliedly repealed one subsection of a statute alone and not another. As of 1994, then, the court believed that WIS. STAT. § 940.04 remained a valid law and had not been repealed. The majority does not disagree. It concedes that § 940.15 did not impliedly repeal § 940.04.

Wis. Act 295. And then it explicitly referenced § 940.04 as a still-enacted abortion law. It stated that the new feticide laws did "not limit the applicability of ss. 940.04, 940.13, 940.15 and 940.16 to an induced abortion."[16] *Id.*, § 12; WIS. STAT. § 939.75(2)(b)1. In other words, after the court in *Black* said § 940.04(2) was not about abortion and was not impliedly repealed, the legislature did not respond by repealing the statute, nor was it silent. Instead, the legislature explicitly stated § 940.04 was still an enforceable statute, and that it was applicable to abortions. *See* § 939.75(2)(b)1.

¶148  The majority does not have an explanation for this, so it engages in misdirection. Despite the enactment saying WIS. STAT. § 940.04 applies "to an induced abortion," the majority says this is irrelevant because WIS. STAT. § 940.13 is also listed, and it "does not prohibit abortions." This is true, and totally beside the point. Section 940.13 provides an exception from criminal liability for women who obtain an abortion. All the listed sections—WIS. STAT. §§ 940.04, 940.13, 940.15 and 940.16—individually and collectively apply to abortion. The point is that this is an explicit acknowledgment in 1997 that the legislature affirmed the ongoing existence of § 940.04 and its applicability to abortion even though it was unenforceable under *Roe*. So the majority makes an entirely irrelevant point and does not even attempt to justify why the legislature would reference a statute that—according to the majority—had been repealed. This is nothing short of judicial sleight of hand, having the appearance of a counterargument, but saying nothing.

¶149  The 1997 amendment should be enough to kill any notion that the legislature intended to repeal WIS. STAT. § 940.04—but there's more.

¶150  In 2001, even though it was still unenforceable under *Roe*, the legislature amended WIS. STAT. § 940.04(1). Prior to the amendment, the statute stated, "Any person, other than the mother, who intentionally destroys the life of an unborn child may be fined not more than $5,000 or

---

[16] The same year, the legislature enacted WIS. STAT. § 940.16 which made it a Class A felony to perform a partial-birth abortion. 1997 Wis. Act 219, § 2. This is defined as "an abortion in which a person partially vaginally delivers a living child, causes the death of the partially delivered child with the intent to kill the child, and then completes the delivery of the child." § 940.16(1)(b).

imprisoned not more than 3 years or both." § 940.04 (1999–2000). But in 2001, the legislature changed the penalty for a violation. 2001 Wis. Act 109, § 586. Instead of a fine of up to $5,000 and imprisonment for 3 years, any person destroying the life of an unborn child would now be "guilty of a Class H felony," which carried, as it does today, a fine of up to $10,000 and imprisonment up to 6 years, or both. Wis. Stat. §§ 940.04 (2001–02); 939.50(3)(h) (2001–02). This means the legislature explicitly changed the consequences for a violation of § 940.04—a dispositive indication that the legislature did not repeal it. The legislature's actions only make sense if it believed this statute was still the law and enforceable but for the court order. Thus, after *Black* rejected the idea that § 940.04 was impliedly repealed, the legislature responded by plainly stating § 940.04 was still a valid law, it was about abortion, and the penalty for a violation should be made more severe.

¶151 The majority's response to this change is also a non sequitur. The majority thinks it scores a point by saying there are "explanations for these changes," and points out this occurred as part of the legislature's larger Truth-in-Sentencing changes. Once again, so what? Of course the legislature had a reason for amending the statute. It is black letter law that when the legislature amends a statute in this way and does not repeal it, a "finding of a repeal by implication [is] simply impossible." *Dairyland Power Coop.*, 52 Wis. 2d at 52. The majority's argument is, quite literally, that the legislature amended a statute it *already repealed*. So in effect, this amendment was just one big oopsie. If that sounds like nonsense, it's because it is.[17]

---

[17] The majority likewise twists the question we ask for implied repeal. The doctrine of implied repeal is in part disfavored because we presume that the legislature acts with knowledge of the body of existing laws. *See United States v. Hansen*, 772 F.2d 940, 944 (D.C. Cir. 1985). As then-Judge Scalia put it:

> The major rationale of the presumption, in modern times at least, is not that Congress is unlikely to change the law . . . but rather, that Congress "legislate[s] with knowledge of former related statutes," and will expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction.

¶152   Given the 2001 amendment, the legislative intent not to repeal the law is abundantly clear—but there's more.

¶153   Ten years later, the legislature again amended WIS. STAT. § 940.04. Before the amendment, there were six subsections. *See* § 940.04 (2009–10). Subsections (1) and (2) imposed criminal penalties on those who perform abortions other than the mother, as they still do. Subsections (3) and (4) imposed different criminal penalties on the mother when she aborted the unborn child herself or consented to an abortion. Subsection (5) provided, as it does now, an exception to abortions that would otherwise be criminal under all four subsections preceding it. And subsection (6) contains the definition for an "unborn child" that applies through all of § 940.04. In 2011, the legislature explicitly repealed subsections (3) and (4) of the statute. *See* 2011 Wis. Act 217, § 11. This was a substantive and substantial change to the reach of § 940.04. Whereas before the statute criminalized people other than the mother under subsection (1) and mothers who received abortions under subsections (3) and (4), the statute now only criminalizes non-mothers.

¶154   The majority tries to explain away this amendment to WIS. STAT. § 940.04 by saying that it was merely a "clean-up amendment." The legislature's decision to explicitly repeal subsections (3) and (4) was unremarkable, we are told, and simply meant to accord with WIS. STAT. § 940.13, the 1985 statute that exempts mothers from criminal liability for abortions. The majority doesn't realize it, but this admission proves that § 940.04(1) has not been impliedly repealed.

¶155   The majority opinion entirely depends on the claim that multiple statutes—most of them enacted before the 2011 amendment— impliedly repealed the broad criminal prohibition of abortion in WIS. STAT. § 940.04(1). Under this logic, when the legislature went about its

---

*Id.* at 944–45 (citation omitted). Said another way, we do not presume that the legislature loses track of a statute and accidentally repeals it.

But the majority's argument on the 2001 amendment seems to be that the legislature had to show an intention to *keep* WIS. STAT. § 940.04 on the books, not discard it, flipping the presumption on its head. That is not how implied repeal works. We look for clear, obvious, and manifest legislative intent to repeal a statute, not legislative intent to preserve it.

statutory "clean-up," § 940.04(1), (3) and (4) were already impliedly repealed, presumably along with the exception to them in (5). Yet, under the majority's rationale, the legislature decided to clean up just two subsections in § 940.04 by explicitly repealing them—but not the other subsections the legislature actually meant to repeal. This is devastating to the majority's argument. When the legislature explicitly repeals parts of a statute and not others, it is actually "evidence of an intention to leave them undisturbed." 82 C.J.S. *Statutes* § 328 (2025). In that way, by removing subsections (3) and (4) while leaving subsection (1), the legislature in fact demonstrated its "implied *approval*" of § 940.04(1). *Id.* (emphasis added). Thus, when the legislature "cleaned up" parts of § 940.04 that were no longer operative—as the majority contends—but left subsection (1) untouched, it proves that the legislature was aware of § 940.04(1) and intended it to remain on the books, unrepealed. To again repeat the black letter law the majority ignores, when the law in question has been amended in this fashion, a "finding of a repeal by implication [is] simply impossible." *Dairyland Power Coop.*, 52 Wis. 2d at 52. While this is dispositive, there's even more.

¶156 In 2015, the legislature responded to another Supreme Court case when it criminalized abortions 20 weeks postfertilization in 2015. *See* 2015 Wis. Act 56, § 7; WIS. STAT. § 253.107(3)(a). The legislature passed the ban upon a finding that there was "substantial medical evidence" a fetus could feel pain at 20 weeks postfertilization. *See* 2015 Wis. Act 56, § 8(1)(j). It then went on to cite *Gonzales v. Carhart* for the proposition that legislatures could pass abortion legislation even when there was medical and scientific uncertainty. *Id.* (citing *Gonzales v. Carhart*, 550 U.S. 124, 164 (2007)). This statute substantially overlapped with the existing prohibition on post-viability abortions, again demonstrating the legislature's penchant for overlapping or even duplicative laws in this area even after *Roe*.

¶157 And also in 2015, the legislature once again referenced WIS. STAT. § 940.04 as a criminal abortion statute. 2015 Wis. Act 64, § 4. The reference is in a statutory revision to John Doe proceedings, which are "independent, investigatory tool[s] used to ascertain whether a crime has been committed and if so, by whom." *In re John Doe Proceeding*, 2003 WI 30, ¶22, 260 Wis. 2d 653, 660 N.W.2d 260; WIS. STAT. § 968.26. In the relevant section, the legislature defined a "crime" for purposes of John Doe proceedings to mean, among other things, a violation of WIS. STAT. § 940.04 "if it is a Class . . . H . . . felony." § 968.26(1b)(a)2.a. The only crime in § 940.04 that constitutes a Class H felony is § 940.04(1). Thus, the legislature explicitly invoked this provision, meaning it anticipated a

situation where a John Doe proceeding could be used to determine whether someone violated the abortion ban in § 940.04(1). This is incomprehensible if § 940.04(1) had been repealed, as the majority contends.

¶158   What does the majority have to say about the legislature's latest reference to WIS. STAT. § 940.04, and subsection (1) in particular, as an ongoing enforceable abortion statute? Not a single thing. It doesn't even give it the old college try. The majority has no answer for why the legislature would reference, and make provision for, a criminal proceeding under a statute it had already repealed. This is the final nail in the majority opinion's coffin. The legislature obviously believed § 940.04 remained a valid law in 2015, and the majority does not argue that the legislature has done anything since to suggest otherwise.

¶159   All of this statutory and legal history is conclusive. To find implied repeal, the legislative intention to repeal WIS. STAT. § 940.04 must be obvious and free from any reasonable doubt. The evidence is, in fact, free from any reasonable doubt that the legislature did not repeal § 940.04. At every turn, the legislature regulated abortion within the then-existing framework established by the Supreme Court. The legislature referenced § 940.04 in later enactments covering decades, and the legislature even amended the text of § 940.04 twice. And it did all of this knowing the statute was unenforceable due to *Roe*. Yet the majority would have us believe that despite all this, the legislature actually repealed § 940.04 altogether. This lawless conclusion is entirely fabricated, finding no support in the law or the facts.

## C.  CONCLUSION

¶160   Putting this together, the petitioners must demonstrate that a singular act covering the entire field of abortion policy was intended by the legislature to repeal older, narrower laws. And the showing must be overwhelmingly clear, manifest, and obvious. At every point, the majority falls on its face. There is no singular act, the scattered provisions do not cover the entire field of abortion policy, and later statutory enactments prove without question that the legislature did not intend to repeal the law.

¶161   Instead, when we look at what the legislature did, an obvious story emerges. The legislature enacted criminal and regulatory laws governing abortion while WIS. STAT. § 940.04 was unenforceable

under *Roe*, but they did not repeal it. This story is borne out in the language of later statutes mirroring Supreme Court standards, the legislature's ongoing references to the applicability of § 940.04 as a criminal abortion statute, and the legislature's two amendments to the statute even when it was unenforceable under *Roe.* As this court has held, when the legislature amends the law in question, a "finding of a repeal by implication [is] simply impossible." *Dairyland Power Coop.*, 52 Wis. 2d at 52.

¶162  In light of the overwhelming evidence that the legislature did not repeal WIS. STAT. § 940.04, how does the majority reach the opposite conclusion? It turns a blind eye to all of it. The majority does not point to a singular act. It does not demonstrate that the smattering of post-*Roe* laws covered the entire field. It does not deal fairly with the text or nature of the later-enacted statutes. It does not wrestle with the relevant statutory evidence—including the references to and amendments of § 940.04 after it was purportedly repealed. The majority does not even countenance *Roe*'s obvious effect on Wisconsin's various post-1973 abortion laws. An honest statutory analysis guided by the law would examine and consider all of this. So given the dramatic holding here—one that functionally erases a law from the books—why didn't the majority consider the statutory evidence and apply the proper legal framework? The reasons are obvious, and they have nothing to do with the law. I dissent.